Gregory A. Kasper
kasperg@sec.gov
Stephen C. McKenna
mckennas@sec.gov
Mark. L. Williams
williamsml@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **1:19-cv-10927** |
| - v. - | |
| **MIMEDX GROUP, INC., PARKER H. PETIT, WILLIAM C. TAYLOR, MICHAEL J. SENKEN,** | **COMPLAINT AND JURY DEMAND** |
| | **ECF CASE** |
| **Defendants.** | |

Plaintiff United States Securities and Exchange Commission (the "SEC"), for its

Complaint against defendants MiMedx Group, Inc. ("MiMedx" or the "Company"), Parker H.

Petit ("Petit"), William C. Taylor ("Taylor"), and Michael J. Senken ("Senken") (collectively,

"Defendants"), alleges as follows:

### SUMMARY

1.      From 2013 through the third quarter of 2017 (the "Relevant Period"), MiMedx, a

biotechnology company that specializes in selling wound care and surgical products, engaged in a

wide-ranging fraud designed to artificially inflate the company's reported revenue.  Three MiMedx

senior executives, since separated from the Company, orchestrated the fraud:  board chairman and chief executive officer ("CEO") Petit, director, president, and chief operating officer ("COO") Taylor, and chief financial officer ("CFO") Senken (collectively, the "Individual Defendants"). This pervasive, long running fraud involved MiMedx's relationship with five of its largest distributors, and resulted in MiMedx misstating millions of dollars of revenue in its financial statements viewed by investors.

2.      From the first quarter of 2013 through the third quarter of 2017, MiMedx improperly recognized revenue at the time it shipped products to Distributor E, its largest distributor.  This improper revenue recognition occurred because of a secret side arrangement between MiMedx and Distributor E, entered into by Petit and Taylor, with Senken's knowledge. This secret side arrangement materially altered the terms of MiMedx's relationship with Distributor E, including allowing Distributor E to pay MiMedx only when it resold the products, and crediting Distributor E for lost, damaged, or returned products.  This side arrangement with Distributor E should have prevented MiMedx from recognizing revenue at shipment.

3.      By 2015, MiMedx's sales to Distributor E were gradually decreasing.  As a result, during the last three quarters of 2015, Petit and Taylor caused MiMedx to improperly record revenue by entering into and concealing side arrangements with four additional distributors: Distributor A, Distributor B, Distributor C, and Distributor D.  Petit and Taylor's concealment of side arrangements with these distributors caused MiMedx to improperly recognize revenue representing at least 6% to 14% of its reported revenue each quarter.

4.      In the second quarter of 2015, Taylor offered payment terms for Distributor A that did not require Distributor A to pay for a $1.9 million order until it received authorization from a foreign government to sell the product, and Taylor misled MiMedx accounting staff about the

status of the authorization.  In the fourth quarter of 2015, Taylor concealed from MiMedx accountants that he had made a secret side arrangement with Distributor A that it need not pay for a $2.54 million order until the product was resold, and that Distributor A could return the product if Distributor A was unable to resell it.  Taylor's actions with Distributor A caused MiMedx to improperly and prematurely recognize millions of dollars of revenue.

5.      Also in the second quarter of 2015, Petit and Taylor caused MiMedx to improperly record $1.4 million of revenue from product sales to Distributor B, by concealing from MiMedx accountants that they had arranged for MiMedx to:  (i) pay the owner of Distributor B $200,000 to induce Distributor B to buy products that quarter; and (ii) ship $1.2 million of products that Distributor B did not need or want with the agreement that Distributor B could swap for different products in the following quarter.

6.      In the third quarter of 2015, Petit and Taylor caused MiMedx to improperly recognize $4.6 million of revenue by concealing from MiMedx accountants that the two of them had altered the payment terms of the agreement between MiMedx and Distributor C.  Distributor C was a startup distributor without available means to pay MiMedx, yet Petit and Taylor assured Distributor C's principal that MiMedx would be flexible about payment.  Then, during the fourth quarter of 2015, Petit caused MiMedx to improperly recognize an additional $1 million in product sales to Distributor C.  Petit did so by touting Distributor C's more than $1.2 million of payments to MiMedx for past orders as evidence that Distributor C could pay for its orders, but concealing from MiMedx's accountants that Distributor C's payments had been funded by a $1.5 million loan from Petit's family to Distributor C.

7.      In the third quarter of 2015, Petit and Taylor again entered into a side agreement that changed material terms of a purchase without disclosing the changes to MiMedx's

accounting department, causing MiMedx to improperly recognize $2.2 million in revenue. Similar to Petit and Taylor's side arrangement with Distributor C, Petit and Taylor assured the owner of Distributor D that MiMedx would not require payment in the timeframe stated on the invoice, and that Distributor D could swap unwanted products in later quarters. Then, in the fourth quarter of 2015, Petit caused MiMedx to improperly recognize another $450,000 in product sales to Distributor D by sending Distributor D a secret, backdated side letter granting Distributor D a right of return if MiMedx's negotiations to acquire Distributor D did not come to fruition. Both of these side agreements materially changed the terms with Distributor D, and caused MiMedx to improperly and prematurely recognize millions of dollars of revenue.

8.      While directing the misstatement of MiMedx's published financial results, Petit, Taylor, and Senken consistently touted the company's artificial revenue growth in SEC filings, press releases, and analyst calls. And from 2016 through early 2018, to cover up their misconduct, Petit, Taylor, and Senken repeatedly lied to and withheld critical information from the Audit Committee of MiMedx's Board of Directors ("Audit Committee"), outside auditors, and outside counsel concerning the company's revenue recognition practices with the five distributors.

9.      Ultimately, Defendants' fraud was uncovered and disclosed to the public in a series of announcements from February 2018 through July 2018. During that time period, MiMedx's stock price fell by approximately 73%, from $14.47 to $3.93, eliminating over $1 billion of MiMedx's shareholder value. In June 2018, Petit, Taylor and Senken separated from MiMedx, and in September 2018, following an investigation by outside counsel, MiMedx's Board of Directors determined that each of the separations were "for cause."

## NATURE OF THE PROCEEDINGS AND REQUESTED RELIEF

10.     The SEC brings this action pursuant to the authority conferred upon it by Section

22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(d),

21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)-(e)

and 78aa].  The SEC seeks permanent injunctions against each of the Defendants, enjoining them

from engaging in the transactions, acts, practices, and courses of business alleged in this

Complaint and from violating, directly or indirectly, the laws and rules alleged in this Complaint;

disgorgement of all ill-gotten gains from the unlawful activity set forth in this Complaint

together with prejudgment interest; civil penalties pursuant to Section 21(d) of the Securities Act

[15 U.S.C. § 77t(d)] and Section 20(d) of the Exchange Act [15 U.S.C. § 78u(d)] against all

Defendants; and, against the Individual Defendants, officer and director bars pursuant Section

20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15

U.S.C. § 78u(d)(2)].  The SEC also seeks an order directing Petit and Senken to reimburse

MiMedx for all bonuses, incentive-based and equity-based compensation, and/or profits realized

from their sale of MiMedx stock pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 [15

U.S.C. § 7243(a)].  The SEC seeks any other relief the Court may deem appropriate pursuant to

Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15

U.S.C. §§ 78u(d), 78u(e), and 78aa].

12.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C.

§ 77v(a)] and Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and

78aa].  Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange.  During the relevant period, MiMedx's stock was traded on the Nasdaq Stock Market ("Nasdaq"), which is located in the Southern District of New York.  MiMedx's stock is currently traded on OTC Link, whose parent company is located in the Southern District of New York.  The false and misleading statements identified in this Complaint were made into, among other places, this district and, upon information and belief, investors in this district read and relied upon the false and misleading statements in making investment decisions.

## DEFENDANTS

13.    **MiMedx Group, Inc.:**  MiMedx is a biotechnology company.  It is a Florida corporation headquartered in Marietta, Georgia.  MiMedx's securities are registered under Section 12(b) of the Exchange Act, and, until November 2018, traded on Nasdaq Global Market.  MiMedx's securities are currently traded on OTC Link.  On July 3, 2013, MiMedx filed a Form S-3 registering an offering of new shares of stock, and, through that offering, MiMedx raised $34 million.  During the Relevant Period and most recently on June 7, 2016, MiMedx filed Forms S-8 to register shares of stock used to provide equity and incentive compensation to its employees, executives, and directors.

14.    **Parker H. Petit:**  Petit is a resident of Roswell, Georgia.  Petit was MiMedx's chairman and CEO from February 2009 to June 2018.  In this role, Petit exercised control over the management, general operations, sales personnel, and related policies of MiMedx, as well as the specific activities upon which MiMedx's violations (as alleged herein) are based.  Petit

signed and certified each of MiMedx's Forms 10-K and certified each of MiMedx's Forms 10-Q filed between 2013 and November 2017.  Petit also signed management representation letters provided to Auditor A, MiMedx's auditor until August 2017, for each annual audit and quarterly review from 2013 through the second quarter of 2017.  Petit signed management representation letters provided to Auditor B, MiMedx's auditor from August 2017 through December 2018, for the quarterly review of the third quarter of 2017.  Prior to joining MiMedx, Petit had spent more than 25 years as CEO of multiple publicly traded companies.

15.     **William C. Taylor:**  Taylor is a resident of Roswell, Georgia.  Taylor was MiMedx's president and COO from 2011 to June 2018, and also served on MiMedx's board of directors.  In this role, Taylor exercised control over the management, general operations, sales personnel, and related policies of MiMedx, as well as the specific activities upon which MiMedx's violations (as alleged herein) are based.  Taylor is an experienced business executive.  Prior to joining MiMedx, Taylor was President and CEO of a company with approximately $85 million in annual revenue.

16.     **Michael J. Senken:**  Senken is a resident of Roswell, Georgia.  Senken was MiMedx's CFO from 2011 to June 2018.   Senken signed and certified each of MiMedx's Forms 10-K and Forms 10-Q filed between 2013 and November 2017.  Senken also signed management representation letters provided to Auditor A for each annual audit and quarterly review from 2013 through the second quarter of 2017.  Senken signed management representation letters provided to Auditor B for the quarterly review of the third quarter of 2017.  Senken completed all required training and passed the certified public accountant ("CPA") examination.  Senken is an experienced business executive.  Prior to joining MiMedx, he was CFO of multiple companies.

## FACTS

I.      **Background**

        A.      **MiMedx's Business**

17.      MiMedx is a regenerative medicine biotechnology company that manufactures and sells a variety of products derived from human placental, amniotic, and umbilical tissues. MiMedx sells these products through its in-house sales force, sales agents, and third-party distributors.

18.      MiMedx's products included wound care and surgical allografts (tissue grafts transplanted between unrelated individuals), sold under the names EpiFix and AmnioFix, similar, private label allografts sold under various brand names, and an injectable amniotic liquid product called OrthoFlo.

19.      MiMedx made direct sales to some customers, and recognized revenue for those sales at the time of shipment.  In addition to making direct sales to customers, MiMedx also consigned products to certain customers.  Consignment sales are different from direct sales in that, among other things, products are shipped but there is no obligation to pay until the products are actually used, the seller retains risk of loss for the products, and the customer can return unsold products.  In relevant SEC filings, MiMedx disclosed that, for consignment customers, revenue was recognized at the time the product was used or implanted.

        B.      **MiMedx's Accounting Responsibilities and Policies**

20.      As a public company, MiMedx was required to file quarterly and annual reports with the SEC that presented its financial results in conformity with U.S. Generally Accepted Accounting Principles ("GAAP").  GAAP are a collection of rules, procedures, and standards that govern accepted accounting and financial reporting practice in the United States.

21.     Pursuant to GAAP, MiMedx cannot recognize revenue in connection with sales of its products until the revenue is realized or realizable and earned, which occurs only when each of the following conditions is met: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred or services have been rendered; (iii) the seller's price to the buyer is fixed or determinable; and (iv) collectibility is reasonably assured.

22.     MiMedx disclosed its revenue recognition policy in each annual and quarterly report during the Relevant Period.  For example, MiMedx's 2015 Form 10-K states:

> The Company sells its products primarily through a combination of a direct sales force, independent stocking distributors and third-party representatives in the U.S. and independent distributors in international markets.  The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance.  In cases where the Company utilizes distributors or ships products directly to the end user, it recognizes revenue according to the shipping terms of the agreement provided all revenue recognition criteria have been met.  A portion of the Company's revenue is generated from inventory maintained at hospitals or with field representatives.  For these products, revenue is recognized at the time the product has been used or implanted.

23.     As detailed herein, Defendants failed to follow MiMedx's policies or to put adequate procedures in place to ensure that the Company's revenue was properly reported.

### C.     MiMedx's Financial Statements and Disclosure of Fraud

24.     As a result of the Defendants' fraud, MiMedx misstated revenue and other important financial metrics in periodic reports filed with the SEC from 2013 through 2017.

25.     During the Relevant Period, Petit, Taylor, and Senken reviewed each of MiMedx's quarterly and annual reports before they were filed with the SEC.  For each annual and quarterly report, Petit and Senken signed certifications required by sections 302 and 906 of the Sarbanes-Oxley Act.  Petit and Senken signed each MiMedx annual report, and Senken signed each MiMedx quarterly report.

26.     Defendants' fraud began to unravel in the first quarter of 2018 when MiMedx's auditor, Auditor B, requested additional information about MiMedx's revenue recognition for Distributor E and about the two prior Audit Committee investigations.  In a February 20, 2018 Form 8-K, MiMedx announced it would delay filing its 2017 Form 10-K in order to conduct an investigation led by outside counsel into allegations related to revenue recognition and certain sales and distribution practices.

27.     In a June 7, 2018 Form 8-K, MiMedx disclosed it would be restating its financial statements for fiscal years 2012-2016 and its condensed financial statements for the first three quarters of 2017.

28.     In June 2018, Petit, Taylor, and Senken separated from MiMedx.  In a September 20, 2018, Form 8-K, MiMedx disclosed that the Board of Directors and Compensation Committee had determined that the separations of Petit, Taylor, and Senken were "for cause."

29.     In a November 7, 2018, Form 8-K, MiMedx disclosed it had received a delisting notice from Nasdaq for failure to file required periodic reports.  In a December 7, 2018, Form 8-K, MiMedx disclosed that Auditor B had resigned as its auditor.  MiMedx has not yet filed restated financial statements.

30.     As a result of the fraud detailed in this Complaint, MiMedx misstated its revenue and operating income, among other financial statement accounts, in every annual and interim period from 2013 through 2017.  The fraud also allowed MiMedx to consistently meet or exceed its revenue estimates from 2013 to 2017.

## II.     MiMedx's and Taylor's Fraudulent Conduct Related to Distributor A

31.     In 2015, Distributor A was a MiMedx distributor located in Saudi Arabia. Distributor A purchased MiMedx products for resale to Saudi government-run medical facilities.

Prior to reselling products to these facilities, Distributor A needed procurement authorization –
also referred to as a public tender – from the Saudi Ministry of Health.

32.     In the second quarter of 2015, Taylor offered extended payment terms to
Distributor A that were contingent on Distributor A receiving a public tender from the Saudi
government and misled MiMedx accounting staff about the payment terms.  Taylor's actions
caused MiMedx to improperly and prematurely recognize approximately $1.9 million in
Distributor A revenue, which represented approximately 4% of MiMedx's second quarter
reported revenue.

33.     In the fourth quarter of 2015, Taylor entered into a secret side agreement with
Distributor A with similar contingent payment terms that he did not disclose to MiMedx
accounting staff.  Taylor's actions caused MiMedx to improperly and prematurely recognize
approximately $2.5 million in Distributor A revenue, which represented approximately 5% of
MiMedx's fourth quarter reported revenue.

**A.**     **Fraudulent and Improper Recognition of Distributor A Revenue in the Second Quarter 2015**

34.     In June 2015, Distributor A placed an initial order to purchase approximately $1.9
million of MiMedx products.  Distributor A secured this order with a letter of credit (a letter
from a bank guaranteeing payment), as required by the February 2015 distribution agreement
between the parties.

35.     In mid-June 2015, MiMedx and Distributor A negotiated a second order, also for
approximately $1.9 million.  At Taylor's direction, this second order was not secured by a line of
credit.

36.     For this second order, MiMedx offered Distributor A extended payment terms for the order that were contingent on resale by Distributor A, with the knowledge and approval of Taylor.

37.     In a June 15, 2015 email that Taylor received, Sales Executive 1 told Distributor A that, after speaking with Taylor, MiMedx was willing to extend payment terms provided shipment occurred on June 29, the next-to-last day of the second quarter.  Sales Executive 1 also said that MiMedx would allow Distributor A to "return the 2nd order at no cost to" Distributor A if the Saudi government did not award the public tender as expected.

38.     On June 25, 2015, Distributor A emailed Taylor and Sales Executive 1 the payment terms for the order "as per our discussion dated (24/06/15)."  The terms state "Payment upon the following: (a) PO is for [Ministry of Health] tender.  Payment follow [*sic*] after 4 months.  (b) If we couldn't sell, we will accept the request from MiMedx to keep the products and keep trying to liquidate in the market and transfer the money accordingly."  In other words, Distributor A was not obligated to pay for the second shipment unless Distributor A was able to resell the product, which required either a second tender from the Saudi Ministry of Health or Distributor A identifying other customers.

39.     The same day, Distributor A submitted purchase order ("PO") 171-2015 for $1.905 million of MiMedx products.  The PO states payment terms are "As per Email Dated: 25/06/2015."

40.     When MiMedx accounting personnel asked about the contingent payment terms, Taylor assured them that, contrary to the June 25 email and PO, Distributor A had already received the tender award from the Saudi Government and that Distributor A had agreed to a

fixed 240 day payment term.  In fact, Taylor knew the tender was not yet awarded and that Distributor A had not agreed to a 240-day fixed payment term.

41.     Despite Taylor knowing that Distributor A's payment was contingent on the tender and subsequent resale, MiMedx improperly recognized $1.905 million in Distributor A revenue for the second quarter of 2015.

42.     MiMedx's recognition of this revenue during the second quarter of 2015 did not comply with GAAP because the revenue was not realized or realizable and earned.

43.     The improper, premature recognition of this revenue was material because a reasonable investor would consider it important to be informed of MiMedx's actual revenue and would consider it important that MiMedx's officers were engaged in fraudulent conduct, including misstatements of revenue and deceptive acts in furtherance of those misstatements in order to artificially increase revenue to show quarter-over-quarter revenue growth.

44.     In light of the above-alleged facts, including the circumstances leading to the accounting entries, as well as his own background, education, and job responsibilities, Taylor knew or was reckless in not knowing and was negligent in not knowing that recording the Distributor A revenue described above during the second quarter of 2015 was improper and did not comply with GAAP.

### B.     Fraudulent and Improper Recognition of Distributor A Revenue in the Fourth Quarter 2015

45.     In late December 2015, following discussions with Taylor and Sales Executive 1, Distributor A placed an order for $2.54 million of MiMedx products.

46.     MiMedx, through Taylor, offered Distributor A contingent payment terms for the order that were not disclosed to MiMedx's accountants.

47.     On December 20, 2015, Distributor A submitted PO 212-2015 for $2.54 million of MiMedx products.  The PO states payment terms are "As per Email Dated: 25/06/2015," the same payment terms as the June 2015 order described above.

48.     On December 21, 2015, Taylor, after speaking with MiMedx accounting personnel, emailed Distributor A stating "[o]ur accountants have asked for a clarification on the Payment Terms."  Taylor communicated to Distributor A that MiMedx's accounting proposed a fixed 180-day payment term.

49.     Minutes later, Taylor sent a second email describing a secret side arrangement. Specifically, Taylor's second email to Distributor A stated that "[i]n the event the tender is delayed . . . MiMedx will give [Distributor A] additional extended payment terms if requested, and will assist Distributor A in selling the product or another option would be to repurchase the product."  Taylor did not disclose this agreement to MiMedx accounting staff.

50.     On December 23, 2015, Distributor A submitted a revised PO 212-2015 for $2.54 million of MiMedx products.  The revised PO stated that payment terms were "6 Months from the shipping date."

51.     On December 28, 2015, Sales Executive 1 forwarded Taylor's second email to Distributor A and reiterated "MiMedx will return repurchase [*sic*] the inventory if needed."

52.     Taylor never disclosed to MiMedx accounting staff the second email or the substance of the contingent payment terms extended to Distributor A.

53.     MiMedx and Taylor never disclosed to Auditor A the second email or the substance of the contingent payment terms extended to Distributor A.

54.     Despite Taylor knowing that Distributor A's payment was contingent on a tender from the Saudi Ministry of Health and that he had extended a right of return to Distributor A,

MiMedx improperly recognized $2.54 million in Distributor A revenue in the fourth quarter of 2015.

55.     MiMedx's recognition of this revenue during the fourth quarter of 2015 did not comply with GAAP because the revenue was not realized or realizable and earned.

56.     The improper, premature recognition of this revenue was material because a reasonable investor would consider it important to be informed of MiMedx's actual revenue and would consider it important that MiMedx's officers were engaged in fraudulent conduct, including misstatements of revenue and deceptive acts in furtherance of those misstatements in order to artificially increase revenue to show quarter-over-quarter revenue growth.

57.     In light of the above-alleged facts, including the circumstances leading to the accounting entries, as well as his own background, education, and job responsibilities, Taylor knew or was reckless in not knowing and was negligent in not knowing that recording the Distributor A revenue described above during the fourth quarter of 2015 was improper and did not comply with GAAP.

## III.     MiMedx's, Petit's, and Taylor's Fraudulent Conduct Related to Distributor B

58.     From 2012-2015, Distributor B was MiMedx's distributor in Texas and, from 2012-2014, MiMedx's second largest customer.  In the second quarter of 2015, Petit and Taylor caused MiMedx to improperly and prematurely recognize at least $1.4 million in revenue associated with a sale of product to Distributor B.  The $1.4 million of improperly and prematurely recognized revenue represented approximately 3% of MiMedx's reported revenue for the quarter.

A.   **Fraudulent and Improper Accounting Related to a $200,000 Payment to Distributor B's Principal**

59.     In mid-June 2015, MiMedx and Distributor B began negotiating the terms of Distributor B's second quarter purchase.  Petit, Taylor, and MiMedx sales personnel worked directly with Distributor B's principal to negotiate a proposed $2 million order, which was a dollar figure MiMedx asked Distributor B to meet.

60.      Distributor B's principal had, in earlier periods and pursuant to a consulting agreement with MiMedx, received MiMedx stock options and restricted stock awards ("RSAs"), some of which had been voided or cancelled after MiMedx terminated the consulting agreement in early 2015.

61.     On or about June 25, 2015, Taylor sent Distributor B's CFO the terms of a possible deal between MiMedx and Distributor B.  In exchange for Distributor B placing a $2 million order for products in MiMedx's inventory that could be shipped by June 30, MiMedx offered, among other things, to (1) grant Distributor B's principal an additional 2,455 RSAs and (2) amend Distributor B's principal's consulting agreement to extend the term beyond the vesting date of all previously awarded options and RSAs.

62.     On or about June 26, 2015, Petit emailed Distributor B's principal to rescind the cancellation of Distributor B's principal's consulting agreement.

63.     On or about June 26, 2015, Petit, Taylor, and other MiMedx sales personnel had a conference call with Distributor B's principal about Distributor B's second quarter order.  During that phone call, Distributor B's principal refused further options or RSAs and, instead, demanded a $200,000 cash payment from MiMedx as a condition of placing a second quarter order.  Distributor B's principal was not going to place an order unless he was paid.

- 16 -

64.     In the afternoon of June 26, 2015, Petit sent Distributor B's principal the revised terms of a deal between MiMedx and Distributor B.  Under the revised terms, in exchange for Distributor B placing a $2 million order of products in MiMedx's inventory that could be shipped by June 30, MiMedx offered to, among other things, (1) pay Distributor B's principal a $200,000 "consulting fee" and (2) pay Distributor B's principal $5,000 for monthly meetings from July to November 2015 where Distributor B's principal would provide consulting services.

65.     Both Petit and Taylor understood that the $200,000 was an inducement to purchase as opposed to a payment for additional consulting services to be provided by Distributor B's principal.

66.     Despite knowing that Distributor B's principal was not performing services for the $200,000 payment, Petit and Taylor directed MiMedx in-house attorneys to prepare an amendment to the Distributor B principal's consulting agreement.  The amendment stated, "In consideration of duties or services provided by the Consultant set forth herein, [MiMedx] shall pay to Consultant a one-time consulting fee . . . to be paid to Consultant on or before June 30, 2015."  In fact, the Distributor B principal never performed any additional consulting services for the $200,000 payment.

67.     Petit and Taylor did not disclose to MiMedx in-house legal or accounting staff that (1) Distributor B's principal was not going to perform any additional consulting services for the payment or (2) the payment was an inducement for Distributor B's second quarter purchase.

68.     On or about July 2, 2015, MiMedx processed the $200,000 payment to Distributor B's principal, and, based on the executed amendment, recorded the payment as an expense.

69.     MiMedx's agreement to pay $200,000 to Distributor B's principal induced Distributor B to place his second quarter order.  As such, this customer inducement should have reduced the revenue MiMedx recognized from the Distributor B order.

70.     The improper recording of the $200,000 payment caused MiMedx to overstate its Distributor B revenue by $200,000 in the second quarter of 2015.

71.     MiMedx, Petit, and Taylor never disclosed to Auditor A that the $200,000 payment was an inducement for Distributor B's second quarter order.

72.     In light of the above-alleged facts, including the circumstances leading to the accounting entries, as well as their own background, education, and job responsibilities, Petit and Taylor knew or were reckless in not knowing and were negligent in not knowing that recording the Distributor B payment described above during the second quarter of 2015 was improper and did not comply with GAAP.

### B.     Fraudulent and Improper Accounting Related to MiMedx's Agreement that Distributor B Could Swap $1.2 Million of Unwanted Products

73.     MiMedx improperly and prematurely recognized approximately $1.2 million of revenue in the second quarter of 2015 because Petit and Taylor agreed that MiMedx would ship unwanted product to Distributor B that Distributor B could swap in subsequent periods.

74.     On June 26, 2015, Petit sent Distributor B's principal an email Taylor had sent Distributor B's CFO the day before that identified the products and quantities MiMedx had in inventory and could ship before the end of the quarter.  This email attached a document that identified the products and quantities that MiMedx wanted Distributor B to order in exchange for the payment to Distributor B's principal described above.

75.     In the evening of June 26, 2015, Distributor B submitted PO 15-0626-MIMEDX, which ordered approximately $2.1 million of MiMedx products.  Distributor B ordered the

specific products and quantities that Distributor B wanted to receive, and not the suggested

product mix reflected in Petit's email.

76.     On June 29, 2015, MiMedx sales personnel, copying Petit, reiterated to

Distributor B that it could not ship by the end of the quarter the specific products and quantities

reflected in PO 15-0626-MIMEDX.  MiMedx identified products and quantities that it had in

inventory and could ship by the end of the quarter.  This product mix included products

Distributor B did not want because it had never sold some of the products and other products

Distributor B did not believe it would be able to sell.

77.     Petit, Taylor, and other MiMedx sales personnel knew that Distributor B did not

want some of the products listed in MiMedx's proposed product mix.  However, with Petit and

Taylor's knowledge, MiMedx made a side arrangement that Distributor B could swap unwanted

product during the third quarter of 2015.  Specifically, MiMedx sales personnel, with Petit and

Taylor's knowledge, asked Distributor B to submit a revised PO reflecting the MiMedx-supplied

product mix "so we can ship what we have now in stock and [MiMedx sales personnel] will

physically come back to Dallas to make the changes in early July."

78.     Over the course of June 29, 2015, MiMedx further refined for Distributor B the

quantities of products that it had in inventory and could ship prior to the end of the quarter.

79.     In the afternoon of June 29, 2015, Distributor B submitted PO 15-0626-MIMEDX

REVISED, which ordered the specific products and quantities that MiMedx told Distributor B it

had in stock and could ship prior to the end of the quarter.  Based on the revised PO, MiMedx

improperly recognized approximately $1.2 million in Distributor B revenue in the second quarter

of 2015, representing the product shipped to Distributor B that Distributor B planned to swap and

did not plan to resell.

80.     Distributor B placed the order based on its agreement with MiMedx that
Distributor B would accept the unwanted products in the second quarter and swap them for the
products Distributor B wanted after MiMedx manufactured them in subsequent periods.

81.     It was improper for MiMedx to recognize at least $1.2 million of Distributor B
revenue in the second quarter of 2015 because delivery of the products that Distributor B
intended to purchase had not been accomplished and the revenue was not earned.  MiMedx's
recognition of $1.2 million in revenue during the second quarter of 2015 did not comply with
GAAP because the revenue was not realized or realizable and earned.

82.     Petit and Taylor never disclosed the Distributor B swap agreement referenced
above to MiMedx accounting personnel or Auditor A.

83.     The improper, premature recognition of this revenue was material because a
reasonable investor would consider it important to be informed of MiMedx's actual revenue and
would consider it important that MiMedx's officers were engaged in fraudulent conduct,
including misstatements of revenue and deceptive acts in furtherance of those misstatements in
order to artificially increase revenue to show quarter-over-quarter revenue growth.

84.     In light of the above-alleged facts, including the circumstances leading to the
accounting entries, as well as their own background, education, and job responsibilities, Petit and
Taylor knew or were reckless in not knowing and were negligent in not knowing that recording
the Distributor B revenue described above during the second quarter of 2015 was improper and
did not comply with GAAP.

85.     On or about August 7, 2015, Petit signed the management representation letter to
Auditor A in connection with Auditor A's second quarter 2015 review of MiMedx's financial
statements.  Through this letter, Petit made materially false and misleading statements and

material omissions regarding transactions with Distributor B, including but not limited to falsely and misleadingly representing that:

    a.  He had fulfilled his responsibilities for the preparation and fair presentation of the financial statements in accordance with GAAP;

    b.  There were no material transactions that had not been properly recorded in the accounting records underlying the financial statements; and

    c.  He had no knowledge of any fraud or suspected fraud involving management, employees who have significant roles in internal control, or which could have a material effect on the financial statements.

## IV.   MiMedx's, Petit's, and Taylor's Fraudulent Conduct Related to Distributor C

86.    In the third quarter of 2015, Petit and Taylor caused MiMedx to improperly and prematurely recognize approximately $4.6 million in revenue related to sales to Distributor C. The $4.6 million of improperly and prematurely recognized revenue represented approximately 9.5% of MiMedx's reported revenue for the quarter.

### A.   Fraudulent and Improper Recognition of Distributor C Revenue in the Third Quarter 2015

87.    Starting in September 2015, Distributor C replaced Distributor B as MiMedx's distributor in Texas.  Distributor C was owned by a former MiMedx sales representative who separated from MiMedx in August 2015.

88.    Distributor C's principal ran Distributor C as a side business during his MiMedx employment.  Distributor C had less than $500,000 in annual revenues before it became a MiMedx distributor and had minimal operating capital.  Based on its limited capital and operating history, Distributor C was not able to pay MiMedx significant amounts until it could generate cash flow by selling MiMedx products.

89.     To assist Distributor C's principal's transition from MiMedx employee to MiMedx distributor, Petit and Taylor caused MiMedx to provide Distributor C's principal a $15,000 per month consulting agreement for "project services relative to the specific entities and individuals identified by" MiMedx.  Petit and Taylor also caused MiMedx to provide a severance package for Distributor C's principal upon his separation from MiMedx.

90.     In the second quarter of 2015, MiMedx acquired a significant supply of a product from a third party manufacturer that it packaged and resold as a new product line under the brand name OrthoFlo.

91.     OrthoFlo is a cryopreserved injectable liquid that must be stored at approximately negative 80 degrees Celsius, which requires specialized freezers.  Distributor C lacked capital to purchase such freezers, so Petit and Taylor directed MiMedx to purchase freezers and provide them to Distributor C.

92.     On or about September 15, 2015, MiMedx and Distributor C signed a distributor agreement.  Under the terms of the agreement, Distributor C was authorized to distribute OrthoFlo and was required to pay on a fixed 30 day term.

93.     Before entering into a distributor agreement with Distributor C, MiMedx took no steps to assess Distributor C's creditworthiness or ability to pay MiMedx.  Petit nonetheless made the decision to allow Distributor C to order up to $4.6 million in products—a dollar value determined by Petit and Taylor.

94.     Between approximately September 24 and September 30, 2015, the last day of the third quarter, Distributor C ordered approximately $4.6 million of MiMedx products, primarily MiMedx's new OrthoFlo product.

95.     Distributor C's $4.6 million order represented MiMedx's second largest sale in its history and accounted for 9.5% of MiMedx's total third quarter 2015 reported revenue.

96.     Petit and Taylor assured Distributor C's principal that, contrary to the payment terms in the Distributor Agreement, MiMedx would be flexible with Distributor C on paying for the order.

97.     Despite the fixed 30-day sales term, neither Petit nor Taylor expected Distributor C to pay MiMedx within 30 days.  Petit and Taylor understood that Distributor C was a new distributor selling a new product, that Distributor C had limited capital until it started selling products and receiving payment from Distributor C's customers, and that Distributor C was therefore not expected to conform with the fixed 30-day term.

98.     MiMedx, through Petit and Taylor, also assured Distributor C that it could swap OrthoFlo after accepting the order if the market for certain sizes (OrthoFlo was sold in various sized vials, ranging from .25 ml to 4 ml) was better than others.

99.     It was improper for MiMedx to recognize the $4.6 million of Distributor C revenue in the third quarter of 2015 because MiMedx agreed to swap some of the product, payment was implicitly excused until Distributor C was paid by its end customers, and MiMedx failed to obtain reliable evidence that payment from Distributor C was collectible.  MiMedx's recognition of $4.6 million of Distributor C revenue during the third quarter of 2015 did not comply with GAAP because the revenue was not realized or realizable and earned.

100.    The improper, premature recognition of this revenue was material because a reasonable investor would consider it important to be informed of MiMedx's actual revenue and would consider it important that MiMedx's officers were engaged in fraudulent conduct,

including misstatements of revenue and deceptive acts in furtherance of those misstatements in order to artificially increase revenue to show quarter-over-quarter revenue growth.

101.    In light of the above-alleged facts, including the circumstances leading to the accounting entries, as well as their own background, education, and job responsibilities, Petit and Taylor knew or were reckless in not knowing and were negligent in not knowing that recording the Distributor C revenue described above during the third quarter of 2015 was improper and did not comply with GAAP.

102.    On or about November 6, 2015, Petit signed the management representation letter to Auditor A in connection with Auditor A's third quarter 2015 review of MiMedx's financial statements.  Through this letter, Petit made materially false and misleading statements and material omissions regarding transactions with Distributor C, including but not limited to falsely and misleadingly representing that:

    a.    He had fulfilled his responsibilities for the preparation and fair presentation of the financial statements in accordance with GAAP;

    b.    There were no material transactions that had not been properly recorded in the accounting records underlying the financial statements; and

    c.    He had no knowledge of any fraud or suspected fraud involving management, employees who have significant roles in internal control, or which could have a material effect on the financial statements.

### B.    Petit Fraudulently Concealed His Family's Loan to Distributor C

103.    In or about November 2015, Distributor C's principal informed Petit that Distributor C did not have money to pay MiMedx for its orders.  He informed Petit he had been turned down for a commercial loan, and he did not know how to obtain money to pay his debt to MiMedx.  He also explained that he did not want to dilute his ownership of Distributor C, so he

was not looking for equity investors.  He asked Petit if Petit knew anyone who might loan money to Distributor C.

104.    Petit referred Distributor C's principal to Petit's son-in-law.  Distributor C's principal contacted Petit's son-in-law, and in or around November or December 2015, Petit arranged for Distributor C's principal to meet his son-in-law and two of his adult children (collectively, the "Petit Children") at MiMedx's headquarters to discuss Distributor C.

105.    The Petit Children agreed to loan Distributor C approximately $1.5 million through a newly-formed limited liability company ("LLC").  The Petit Children funded the loan with funds withdrawn from trust accounts Petit had established for them.

106.    Petit received drafts of the LLC agreement forming the Petit Children's new entity, the promissory note for the loan to Distributor C, and a pledge and security agreement related to the loan.  Petit also sent a draft of the promissory note to Distributor C's principal.

107.    On or about December 21, 2015, Distributor C received a $1.5 million loan from the Petit Children's LLC.  Over the next two weeks, Distributor C used the proceeds of the loan to pay MiMedx approximately $1.2 million, which represented Distributor C's first substantial payments to MiMedx on the $4.6 million third quarter orders.

108.    Petit learned no later than December 25, 2015, that the Petit Children had loaned the money to Distributor C when his son-in-law confirmed that fact to him.

109.    Based, in part, on the comfort that Distributor C had the ability to pay for additional product because of the $1.2 million payments made for past purchases, MiMedx, through Petit and Taylor, authorized a new shipment to Distributor C and recognized approximately $1 million of additional Distributor C revenue on December 30, 2015.

110.     Petit never disclosed to MiMedx's internal accounting staff or Auditor A that he knew as of November 2015 that Distributor C had been rejected for a commercial loan and lacked capital to pay its $4.6 million accounts receivable balance to MiMedx.

111.     Petit never disclosed to MiMedx's internal accounting staff or Auditor A that the Petit Children loaned Distributor C $1.5 million, which allowed Distributor C to make its $1.2 million in payments during the fourth quarter of 2015.

112.     On or about February 29, 2016, Petit signed the management representation letter to Auditor A in connection with Auditor A's 2015 annual audit of MiMedx's financial statements.  Through this letter, Petit made materially false and misleading statements and material omissions regarding transactions with Distributor C, including but not limited to falsely and misleadingly representing that:

    a.   He had fulfilled his responsibilities for the preparation and fair presentation of the financial statements in accordance with GAAP;

    b.   There were no material transactions that had not been properly recorded in the accounting records underlying the financial statements;

    c.   He had no knowledge of any fraud or suspected fraud involving management, employees who have significant roles in internal control, or which could have a material effect on the financial statements; and

    d.   There are no side agreements or other arrangements (either written or oral) that have not been disclosed to Auditor A.

## V.     MiMedx's and Petit's Fraudulent Conduct Related to Distributor D

113.     In the third and fourth quarters of 2015, Petit caused MiMedx to improperly and prematurely recognize approximately $2.65 million in revenue related to sales to Distributor D.

The approximately $2.2 million in revenue MiMedx recognized improperly and prematurely in the third quarter represented approximately 4% of MiMedx's reported revenue in that quarter.

      **A.**    **Fraudulent and Improper Recognition of Distributor D Revenue in the Third Quarter 2015**

114.    Starting in the third quarter of 2015, MiMedx, through Petit and Taylor, and Distributor D began discussions about ways the two businesses could work together.  Distributor D was a distributor of a MiMedx competitor's products and was also developing its own line of biologic products.

115.    In September 2015, MiMedx and Distributor D scientific staff engaged in meetings about the companies' products as part of discussions about a possible strategic transaction or acquisition by MiMedx.  MiMedx was also looking for sales channels for its new OrthoFlo product.

116.    On or about September 18, 2015, Sales Executive 1 emailed Petit, Taylor, and other senior MiMedx executives to discuss a call he had with one of Distributor D's principals that day:

> They are excited to work with us and he asked me "what can I personally do for you."  I told him we will need to move a significant amount of liquid into his freezer and he said "it's done."  This couldn't have happened at a better time.

117.    MiMedx, through Petit and Taylor, and Distributor D discussed a distributor agreement, but they did not reach agreement on terms of the relationship by the end of the third quarter.

118.    Despite not having a signed distributor agreement or agreement on the terms governing any purchases, Distributor D submitted POs on the final days of the third quarter of 2015 for approximately $2.2 million of MiMedx products, including approximately $1.45 million of OrthoFlo and approximately $740,000 of other MiMedx products.  Distributor D's

POs stated that payment was due on a fixed 30 day term, but Petit, Taylor, and Distributor D each understood that Distributor D would not be required to make payment within 30 days.

119.    Distributor D submitted POs for the products and quantities that MiMedx identified for Distributor D, which were products and quantities in MiMedx's inventory that could be shipped before the close of the third quarter, including larger sized vials of OrthoFlo that Distributor D did not need or want.  MiMedx, through Petit, agreed with Distributor D that Distributor D could later swap large sized OrthoFlo vials for smaller sized vials.

120.    It was improper and premature for MiMedx to recognize the $2.2 million of Distributor D revenue in the third quarter of 2015 because the parties were still negotiating the terms of the arrangement.  MiMedx's recognition of $2.2 million of Distributor D revenue during the third quarter of 2015 did not comply with GAAP because the revenue was not realized or realizable and earned.

121.    The improper, premature recognition of this revenue was material because a reasonable investor would consider it important to be informed of MiMedx's actual revenue and would consider it important that MiMedx's officers were engaged in fraudulent conduct, including misstatements of revenue and deceptive acts in furtherance of those misstatements in order to artificially increase revenue to show quarter-over-quarter revenue growth.

122.    In light of the above-alleged facts, including the circumstances leading to the accounting entries, as well as his own background, education, and job responsibilities, Petit knew or was reckless in not knowing and was negligent in not knowing that recording the Distributor D revenue described above during the third quarter of 2015 was improper and did not comply with GAAP.

123.    On or about November 6, 2015, Petit signed the management representation letter to Auditor A in connection with Auditor A's third quarter 2015 review of MiMedx's financial statements.  Through this letter, Petit made materially false and misleading statements and material omissions regarding transactions with Distributor D, including but not limited to falsely and misleadingly making the representations listed in paragraph 102.

### B.    Fraudulent and Improper Recognition of Distributor D Revenue in the Fourth Quarter 2015

124.    During the fourth quarter of 2015, negotiations between MiMedx and Distributor D regarding the distributor agreement continued.  Among other items, negotiations related to non-compete language in MiMedx's standard distributor agreement.  Distributor D both had a substantial inventory of MiMedx competitor products it wanted to sell and was developing its own biologic products, some of which would compete with MiMedx if brought to market. Distributor D wanted assurances that it would not be bound by the non-compete language if acquisition talks between MiMedx and Distributor D fell apart.

125.    On or about December 31, 2015, Petit sent Distributor D a side letter, dated September 25, 2015, stating "if our discussions do not come to a conclusion within a reasonable period of time and you still wish to produce your own amniotic products, we will commit to exchange or take back any of our amniotic related products."  This side letter confirmed a right of return for Distributor D that precluded revenue recognition for the third quarter sales and also precluded recognition of the fourth quarter sale.

126.    After receiving the Petit side letter, Distributor D agreed to sign a MiMedx distributor agreement.  Distributor D, however, did not execute the distributor agreement until late January 2016, after MiMedx had acquired Distributor D and Distributor D's principals had become MiMedx employees.

127.    After receiving the Petit side letter, Distributor D also placed a MiMedx order worth $450,000, for specific products and quantities supplied by MiMedx, including products Distributor D had never sold and for which Distributor D had no customers.

128.    Petit never disclosed to MiMedx's internal accounting staff or Auditor A that he had sent the Distributor D side letter or granted a right of return.

129.    It was improper and premature for MiMedx to recognize the $450,000 of Distributor D revenue in the fourth quarter of 2015 because Distributor D had a right of return and collectibility was not reasonably assured.  MiMedx's recognition of $450,000 of Distributor D revenue during the fourth quarter of 2015 did not comply with GAAP because the revenue was not realized or realizable and earned.

130.    The improper, premature recognition of this revenue was material because a reasonable investor would consider it important to be informed of MiMedx's actual revenue and would consider it important that MiMedx's officers were engaged in fraudulent conduct, including misstatements of revenue and deceptive acts in furtherance of those misstatements in order to artificially increase revenue to show quarter-over-quarter revenue growth.

131.    In light of the above-alleged facts, including the circumstances leading to the accounting entries, as well as his own background, education, and job responsibilities, Petit knew or was reckless in not knowing and was negligent in not knowing that recording the Distributor D revenue described above during the fourth quarter of 2015 was improper and did not comply with GAAP.

132.    On or about January 10, 2016, MiMedx publicly disclosed that it had signed a definitive agreement to acquire Distributor D for a combination of cash and stock totaling approximately $10 million.  After acquisition, MiMedx consolidated Distributor D's financial

statements into its own, which had the practical effect of eliminating Distributor D's approximately $2.4 million accounts receivable balance.

133.    On or about February 29, 2016, Petit signed the management representation letter to Auditor A in connection with Auditor A's 2015 annual audit of MiMedx's financial statements.  Through this letter, Petit made materially false and misleading statements and material omissions regarding transactions with Distributor D, including but not limited to falsely and misleadingly making the representations listed in paragraph 112.

## VI.    **Defendants' Fraudulent Conduct Related to Distributor E**

134.    From approximately 2012-2017, Distributor E was a distributor of MiMedx products to U.S. Department of Veterans Affairs and U.S. Department of Defense medical facilities (collectively, the "VA").  Based on the conduct of Petit, Taylor, and Senken, MiMedx improperly and prematurely recognized revenue on sales to Distributor E from not later than January 1, 2013, to the end of the relationship in July 2017.

135.    Distributor E was MiMedx's largest customer for much of the relationship, and Petit personally managed almost all interactions with Distributor E's principals.  Distributor E sales represented 56% of MiMedx's total reported revenue in 2013; 34% of total reported revenue in 2014; 24% of total reported revenue in 2015; and a declining annual percentage thereafter, as both MiMedx's total sales grew and Distributor E revenue decreased.

136.    Between 2012 and 2017, MiMedx reported more than $150 million in Distributor E revenue, approximately 8% of which was never collected.

137.    In April 2012, MiMedx and Distributor E entered into a written distribution agreement, which was amended four times between approximately 2012 and 2016.  Under the terms of the distribution agreement and its amendments, MiMedx made direct sales to Distributor E, meaning title and risk of loss passed upon shipment and payment was due within a

specific period of time after the invoice date, without regard to Distributor E's sales to its customers.

138.    On this basis, MiMedx recognized Distributor E revenue at the time it shipped product to Distributor E.

139.    By at least January 1, 2013, however, Petit and Taylor entered into a side arrangement with Distributor E that, contrary to the terms of the written agreement, transformed it, in substance, into a consignment relationship in which Distributor E was not required to pay MiMedx for any product unless and until it received payment from the VA.  Senken knew or was reckless in not knowing and should have known about this agreement.  As a result of this side arrangement, MiMedx should have recognized Distributor E revenue at the time Distributor E paid MiMedx.  MiMedx's recognition of revenue at the time of shipment to Distributor E was improper and contrary to GAAP.

140.    As a result, MiMedx's reported revenue from sales to Distributor E was improperly and prematurely recognized, and MiMedx misstated its revenue in every quarter from at least the first quarter of 2013 through the third quarter of 2017.

141.    The improper, premature recognition of this revenue, in each period, was material because a reasonable investor would consider it important to be informed of MiMedx's actual revenue and would consider it important that MiMedx's officers were engaged in fraudulent conduct.

## A.    Development of the Undisclosed Distributor E Side Arrangement

142.    When MiMedx began its relationship with Distributor E in or around 2012, Distributor E purchased limited quantities of MiMedx products.

143.    In late 2012, MiMedx, through Petit and Taylor, asked Distributor E to make bulk orders of product to stock at the VA on consignment, pursuant to consignment agreements

between Distributor E and various VA facilities.  Distributor E was willing to use its VA consignment agreements for MiMedx products but did not want to be liable for payment to MiMedx until the VA used the Distributor E products and committed to pay Distributor E.

144.    To get Distributor E to agree to order products on a bulk basis and stock the inventory at the VA, MiMedx, through Petit and Taylor, excused payment from Distributor E until the VA issued a PO to Distributor E for products used, which was contrary to the terms of the written distribution agreement.  Senken knew or was reckless in not knowing and should have known about this agreement.

145.    MiMedx, through Petit and Taylor, also agreed to credit Distributor E for any dropped, damaged, or missing products stocked at the VA in Distributor E's consignment inventory, and Senken knew or was reckless in not knowing and should have known about this agreement.

146.    MiMedx also agreed, through Petit and Taylor, to allow Distributor E to return to MiMedx any products stocked at the VA in Distributor E's consignment inventory that the VA did not want and asked to have returned, and Senken knew or was reckless in not knowing and should have known about this agreement.  Risk of loss for the products did not transfer to Distributor E at the time MiMedx shipped products to the VA.

147.    In this manner, MiMedx, through Petit and Taylor, and Distributor E agreed to a side arrangement that was, in substance, a consignment relationship.  Based on this side arrangement, GAAP prohibited revenue recognition at the time of shipment because revenue from sales to Distributor E was not realized or realizable and earned.  Nonetheless, MiMedx recognized revenue at the time of shipment throughout the relationship.

**B.** **MiMedx's Agreement to the Distributor E Side Arrangement**

148.    MiMedx's actions demonstrate that MiMedx, through Petit and Taylor, and Distributor E had an agreement over the key aspects of the side arrangement that was contrary to the terms of the distribution agreement.  Senken knew or was reckless in not knowing and should have known about this arrangement.

*Payment Practices*

149.    Petit and Taylor caused MiMedx to devote substantial time and money to managing the payment aspects of the Distributor E side arrangement.  Senken knew or was reckless in not knowing and should have known about this arrangement.

150.    MiMedx closely tracked Distributor E's receipt of POs from the VA, which obligated the VA to pay Distributor E for products used.

151.    Each weekday from late 2012 to the 2017 end of the relationship, Distributor E sent to MiMedx a daily report listing each product for which Distributor E had received a PO from the VA, the price the VA paid for the product, and the patient on whom the product was used.

152.    The report was sent to a group reporting directly to Executive Vice President 1, one of Taylor's direct reports.  This group was known internally as the reconciliation group or federal reconciliation group ("Reconciliation Group").  At its peak, three full-time employees worked in the Reconciliation Group.  The Reconciliation Group was located outside of MiMedx's accounting staff.

153.    Reconciliation Group personnel emailed Executive Vice President 1 each day reporting the total dollar value of VA POs Distributor E had received.  Executive Vice President 1 occasionally forwarded that email to Petit, Taylor, Senken, and others.

154.    The Reconciliation Group created tables called "Weekly Revenue" that compiled the daily totals from Distributor E's daily reports.  The Weekly Revenue table was circulated each Monday to Executive Vice President 1, Controller 1, who reported directly to Senken, and another MiMedx accounting employee.  The Weekly Revenue table was occasionally forwarded to Petit, Taylor, and Senken.

155.    Approximately 10 days after the close of each week, Distributor E paid MiMedx the total cash amount identified in the Weekly Revenue table, to the penny.  Reconciliation Group staff confirmed against their records that Distributor E's payment matched the anticipated amount.

156.    In this manner, Distributor E paid MiMedx only the value of Distributor E's sales to the VA, its end customer.  Petit, Taylor, and Senken knew or were reckless in not knowing about this arrangement, and each of them knew or were reckless in not knowing that MiMedx devoted substantial resources to ensure Distributor E paid MiMedx the full value of its VA sales, within days of use of the product.  Distributor E made payments according to this arrangement from at least January 2013 through the end of the relationship in 2017.  At no point during that period did Distributor E make payments consistent with the terms of the distribution agreement.

157.    In September 2013, Controller 1, then MiMedx's controller and Senken's direct report, forwarded to Senken an email showing a Distributor E Weekly Revenue table and stated:

> This may not be the first time that you are seeing this, but it is the first time that I am seeing this.  It looks like we tell them what to pay based on their weekly revenue?  So our 75-80 days for payment is only a coincidence.

158.    Senken did not express surprise or concern.  As discussed below, Senken would receive a similar report from a different controller three years later and, again, express no

surprise or concern and make no further inquiry into MiMedx's accounting for sales to Distributor E.

159.    Distributor E made approximately 12 payments from 2013 to 2017 that were "early" or "advance" payments.  However, each such payment amount was calculated based on the side agreement payment practice and subsequent payments were reduced to account for the "early" payments until Distributor E resumed paying pursuant to the side agreement.  These "early" payments were requested by MiMedx to improve cash flow performance and were agreed to by Distributor E in exchange for discounts on its accounts receivable balance.

160.    MiMedx had no practices like the Reconciliation Group's for any distributor other than Distributor E.

*Inventory Management*

161.    Petit and Taylor caused MiMedx to devote substantial resources to managing the inventory stocked at the VAs, despite the fact that pursuant to the terms of the distribution agreement the product was purportedly owned by Distributor E.  Petit, Taylor, and Senken knew or were reckless in not knowing and should have known that MiMedx sales personnel effectively managed the inventory at the VA.

162.    Distributor E had no sales representatives that called on VA facilities with respect to MiMedx products.

163.    Taylor—who directly supervised MiMedx's sales staff—and Petit required MiMedx sales staff to do quarterly physical inventory counts at each VA facility.

164.    Sales staff reported inventory information back to the Reconciliation Group.  If a product that the Reconciliation Group believed was supposed to be at a VA facility was missing from physical inventory, then it was the sale representative's responsibility to research what

happened to the product.  In many cases, MiMedx determined that a product had been used, but the VA had not issued Distributor E a PO for the product (such products were referred within MiMedx as "Implanted No PO" products).  Under the terms of the side arrangement, Distributor E was not required to pay MiMedx for the product until it received a PO from the VA, so it was the sales representative's responsibility to resolve the Implanted No PO product by working with VA medical staff to get the physician to submit the paperwork necessary for the VA to issue a PO.

165.    If an Implanted No PO tissue could not be resolved in this way, then MiMedx credited Distributor E for the value of the missing tissue.  Petit, Taylor, and Senken knew or were reckless in not knowing and should have known about Implanted No PO tissues and understood that MiMedx would have to credit Distributor E the value of these losses if the VA did not provide a PO to Distributor E.

166.    Similarly, if MiMedx sales representatives reported that a product was dropped during a procedure or damaged while opening the packaging or otherwise, then MiMedx credited Distributor E the value of the loss.  Petit, Taylor, and Senken knew of MiMedx's crediting practices for losses.

167.    Similarly, if MiMedx sales representatives learned that a VA facility wanted to return products, MiMedx accepted that return and credited the Distributor E accounts receivable balance for the amount of the return.  Petit, Taylor, and Senken, knew of MiMedx's crediting practices for Distributor E's product returns.

168.    MiMedx retained risk of loss on all sales to Distributor E.

*Taylor's March 2013 Email*

169.     MiMedx's conduct alone demonstrates its understanding and assent to the side

arrangement between MiMedx and Distributor E.  On March 8, 2013, Taylor sent an email to

Distributor E acknowledging the course of dealing that was materially different from the

distribution agreement and agreeing to proceed in that manner (the "2013 Taylor Email").

170.     Taylor wrote:

I want to reiterate the practical aspect of our relationship.  Our contract states our legal
terms and obligations, but like all business relationships, once signed, we need flexibility
that meets both our business needs.

Contractually, [Distributor E] owns the inventory once received . . ., but practically
speaking, MiMedx will work with [Distributor E] if any issues arise with the inventory. .
. . Because MiMedx is directing the placements in the 120+ VAs we service, we
obviously are very involved with the inventory management and will not leave you with
any losses!

Regarding payment, we've established a history over the past six months, and we are
satisfied with the arrangement.  Although it is a [*sic*] slightly different than the way the
contract is written, we see no need to change what has become our standard practice.

171.     Taylor never disclosed the 2013 Taylor Email to MiMedx accounting staff,

MiMedx's in-house or external attorneys, or Auditor A.

### C.     MiMedx's Improper Revenue Recognition for Distributor E

172.     Pursuant to GAAP, MiMedx could not recognize revenue at the time of shipment

for sales to Distributor E from January 2013 to July 2017 because the arrangement with

Distributor E was, in substance, a consignment arrangement.  GAAP requires that financial

reporting reflect the economic substance of an arrangement regardless of contractual form.  More

specifically, MiMedx excused Distributor E from paying until it resold to the VA and MiMedx

retained risk of loss by crediting Distributor E for all dropped, damaged, missing, and returned

products.  From January 2013 to July 2017, MiMedx's recognition of Distributor E revenue was

improper and premature under GAAP because it was not realized or realizable and earned.

173.     As a result of this improper and premature recognition of Distributor E revenue, MiMedx misstated its revenue and operating income in each quarter, year, and interim period from 2013 to 2017.

174.     The improper and premature recognition of this revenue was material because a reasonable investor would consider it important to be informed of MiMedx's actual revenue and would consider it important that MiMedx's officers were engaged in fraudulent conduct.

175.     In light of the above-alleged facts, including the circumstances leading to the accounting entries, as well as their own background, education, and job responsibilities, Petit, Taylor, and Senken knew or were reckless in not knowing and were negligent in not knowing that reporting the Distributor E revenue described above from the first quarter of 2013 to the third quarter of 2017 was improper and did not comply with GAAP.

176.     In connection with each Auditor A quarterly review and Auditor A annual audit from the first quarter of 2013 through the second quarter of 2017, Petit and Senken signed management representation letters to Auditor A.  Through these letters, Petit and Senken made materially false and misleading statements and material omissions regarding transactions with Distributor E, including but not limited to falsely and misleadingly representing, among other things, the representations listed in paragraph 112.

177.     On or about October 31, 2017, Petit and Senken signed a management representation letter to Auditor B in connection with Auditor B's third quarter of 2017 review. Through this letter, Petit and Senken made materially false and misleading statements and material omissions regarding transactions with Distributor E, including but not limited to falsely and misleadingly representing among other things that:

a. They had fulfilled their responsibilities for the preparation and fair presentation of the financial statements as of the end of the third quarter of 2017 and for the full year ending December 31, 2016, in accordance with GAAP;

b. There were no material transactions that had not been properly recorded in the accounting records underlying the financial statements;

c. They had no knowledge of any fraud or suspected fraud involving management, employees who have significant roles in internal control, or which could have a material effect on the financial statements; and

d. There were been no side agreements or other arrangements (either written or oral) that had not been disclosed to Auditor B.

## VII.   MiMedx, Petit, Taylor, and Senken Made Material False and Misleading Statements

178.   As a result of the fraudulent and improper entries described above, MiMedx's financial results, including its revenue, were materially misstated for every period from the first quarter of 2013 to the third quarter of 2017.  MiMedx's SEC filings also contained misstatements and omissions regarding its revenue recognition policies and practices.

179.   As reflected in the table below, MiMedx misstated its financial results and made other misstatements and omissions from 2013 through 2017 based on improper and fraudulent revenue recognition practices for sales in the following periods:

| Time Period for Sales | Related SEC Filings | Distributor(s) with Improperly Recognized Revenue |
|---|---|---|
| Q1 2013 | Form 10-Q; Form 8-K | Distributor E |
| Q2 2013 | Form 10-Q; Form 8-K | Distributor E |
| Q3 2013 | Form 10-Q; Forms 8-K | Distributor E |
| Q4 & Full Year 2013 | Form 10-K; Form 8-K | Distributor E |
| Q1 2014 | Form 10-Q; Forms 8-K | Distributor E |
| Q2 2014 | Form 10-Q; Forms 8-K | Distributor E |
| Q3 2014 | Form 10-Q; Forms 8-K | Distributor E |

| Q4 & Full Year 2014 | Form 10-K; Forms 8-K | Distributor E |
|---|---|---|
| Q1 2015 | Form 10-Q; Forms 8-K | Distributor E |
| Q2 2015 | Form 10-Q; Forms 8-K | Distributor A, Distributor B, Distributor E |
| Q3 2015 | Form 10-Q; Form 8-K | Distributor C, Distributor D, Distributor E |
| Q4 & Full Year 2015 | Form 10-K; Forms 8-K | Distributor A, Distributor B, Distributor C, Distributor D, Distributor E |
| Q1 2016 | Form 10-Q; Forms 8-K | Distributor E |
| Q2 2016 | Form 10-Q; Forms 8-K | Distributor E |
| Q3 2016 | Form 10-Q; Forms 8-K | Distributor E |
| Q4 & Full Year 2016 | Form 10-K; Forms 8-K | Distributor E |
| Q1 2017 | Form 10-Q; Forms 8-K | Distributor E |
| Q2 2017 | Form 10-Q; Forms 8-K | Distributor E |
| Q3 2017 | Form 10-Q; Forms 8-K | Distributor E |

## A.   2013 through 2014

180.    In 2013 and 2014, MiMedx filed the following Forms 10-Q, 10-K, and 8-K

containing the false or misleading statements identified below.

      a.  First Quarter 2013:  Form 10-Q, filed May 10, 2013, and Form 8-K, filed May 1,

         2013 reported revenue of approximately $11.56 million and operating loss of

         approximately $230,000.  The Form 8-K falsely stated that MiMedx exceeded its

         revenue forecast.

      b.  Second Quarter 2013:  Form 10-Q, filed August 8, 2013, and Form 8-K, filed July

         31, 2013, reported revenue of approximately $13.52 million and operating loss of

         approximately $740,000.  The Form 8-K falsely stated that MiMedx exceeded its

         revenue forecast.

      c.  Third Quarter 2013:  Form 10-Q, filed November 8, 2013, and Forms 8-K, filed

         October 17 and October 30, 2013, reported revenue of approximately $16.12

million and operating loss of approximately $260,000.  The Forms 8-K falsely stated that MiMedx exceeded its revenue forecast.

d.  <u>Fourth Quarter and Full Year 2013</u>:  Form 10-K, filed March 4, 2014, and Form 8-K, filed February 26, 2014, reported fourth quarter revenue of approximately $18 million and operating loss of approximately $1.41 million.  The Form 8-K falsely stated that MiMedx exceeded its quarterly revenue forecast.  The same Forms 10-K and 8-K reported full year 2013 revenue of approximately $59.2 million and operating loss of approximately $2.6 million.

e.  <u>First Quarter 2014</u>:  Form 10-Q, filed May 12, 2014, and Forms 8-K, filed April 7 and April 25, 2014, reported revenue of approximately $19.6 million and operating loss of approximately $890,000.  The Form 8-K falsely stated that MiMedx exceeded its revenue forecast.

f.  <u>Second Quarter 2014</u>:  Form 10-Q, filed August 11, 2014, and Form 8-K, filed July 28 and amended July 29, 2014, reported revenue of approximately $25.6 million and operating loss of approximately $390,000.

g.  <u>Third Quarter 2014</u>:  Form 10-Q, filed November 10, 2014, and Forms 8-K, filed October 14 and October 30, 2014, reported revenue of approximately $33.5 million and operating income of approximately $3.7 million.

h.  <u>Fourth Quarter and Full Year 2014</u>:  Form 10-K, filed March 13, 2015, and Forms 8-K, filed January 12 and February 26, 2015, reported fourth quarter revenue of approximately $39.6 million and operating income of approximately $4.7 million.  The same Forms 10-K and 8-K reported full year 2014 revenue of approximately $118.2 million and operating income of approximately $7.1 million.  The Form 8-

K falsely stated that MiMedx's 2014 full year revenue exceeded the company's revenue forecast.

181.    Each of the statements described above was false or misleading because of the fraudulent and improper Distributor E accounting described above.

182.    MiMedx made each of the misstatements concerning its revenue and operating income in the Forms 10-K, 10-Q, and 8-K described above.

183.    Petit, Taylor, and Senken, in engaging in the conduct alleged in this complaint, acted within the course and scope of their employment and authority as the CEO, President and COO, and CFO, respectively, of MiMedx.  As such, their knowledge, recklessness, and negligence are imputed to MiMedx.

184.    The improper and premature recognition of this revenue was material because a reasonable investor would consider it important to be informed of MiMedx's actual revenue and would consider it important that MiMedx's officers were engaged in fraudulent conduct, including misstatements of revenue and deceptive acts to improperly inflate revenue because of the fraudulent and improper Distributor E revenue recognition.  Revenue from Distributor E represented approximately 56% of MiMedx's 2013 revenue and approximately 34% of MiMedx's 2014 revenue.

### B.    First Quarter of 2015

185.    On May 1, 2015, MiMedx filed its Form 10-Q for the first quarter of 2015.  The Form 10-Q reported revenue of approximately $40.8 million and operating income of approximately $4.25 million.

186.    On April 14, 2015, MiMedx filed a Form 8-K with a press release that reported quarterly revenue of $40.8 million and highlighted that MiMedx's "Q1 revenue [was] in upper

end of $40 to $41 million Q1 2015 guidance" and that the quarter was the "14th consecutive quarter of meeting or exceeding revenue guidance."

187.    On April 28, 2015, MiMedx filed a Form 8-K with a press release that reported quarterly revenue of $40.8 million and operating income of $4.2 million.  In that press release, Petit stated that "[i]t was our fourteenth consecutive quarter of meeting or exceeding revenue guidance."

188.    Each of the statements described above was false or misleading because of the fraudulent and improper Distributor E accounting described above.

189.    MiMedx, Petit, and Senken made the misstatements concerning MiMedx's revenue in the Forms 10-Q and 8-K described above.  Petit, Taylor, and Senken reviewed and approved the statements before they were made.  Senken signed the Forms 10-Q and 8-K.  Petit and Senken certified MiMedx's Form 10-Q.

190.    MiMedx, Petit, and Senken knew or were reckless in not knowing and were negligent in not knowing that the statements were false and misleading when made.

191.    The improper and premature recognition of this revenue was material because a reasonable investor would consider it important to be informed of MiMedx's actual revenue and would consider it important that MiMedx's officers were engaged in fraudulent conduct, including misstatements of revenue and deceptive acts to improperly inflate revenue because of the fraudulent and improper Distributor E revenue recognition.  Revenue from Distributor E represented approximately 34% of MiMedx's quarterly revenue.

### C.    Second Quarter of 2015

192.    On August 7, 2015, MiMedx filed its Form 10-Q for the second quarter of 2015. The Form 10-Q reported revenue of approximately $45.68 million and operating income of approximately $5.65 million.

193.    On July 30, 2015, MiMedx filed a Form 8-K with a press release that reported quarterly revenue of $45.7 million and highlighted that MiMedx's "[r]evenue is at the upper end of Company Q2 guidance."  The Form 8-K also reported revenue of $86.4 million for the six months ended June 30, 2015.

194.    On August 7, 2015, MiMedx filed a Form 8-K with a press release that reported quarterly revenue of "$45.7 million . . . which was above analyst consensus and only $321,000 below the Company's high end guidance."

195.    Each of the statements described above was false or misleading because of the fraudulent and improper Distributor A, Distributor B, and Distributor E accounting described above.

196.    MiMedx, Petit, and Senken made the misstatements concerning MiMedx's revenue in the Forms 10-Q and 8-K described above.  Petit, Taylor, and Senken reviewed and approved the statements before they were made.  Senken signed the Forms 10-Q and 8-K.  Petit and Senken certified MiMedx's Form 10-Q.

197.    MiMedx, Petit, and Senken knew or were reckless in not knowing and were negligent in not knowing that the statements were false and misleading when made.

198.    The improper and premature recognition of this revenue was material because a reasonable investor would consider it important to be informed of MiMedx's actual revenue and would consider it important that MiMedx's officers were engaged in fraudulent conduct, including misstatements of revenue and deceptive acts to improperly inflate revenue because of the fraudulent and improper Distributor A, Distributor B, and Distributor E revenue recognition. Revenue from Distributor E represented approximately 26% of MiMedx's quarterly revenue.

Revenue from Distributor A and Distributor B represented approximately 7% of MiMedx's quarterly revenue.

### D.  Third Quarter of 2015

199.    On November 6, 2015, MiMedx filed its Form 10-Q for the third quarter of 2015. The Form 10-Q reported revenue of approximately $49.01 million and operating income of approximately $6.71 million.

200.    On October 29, 2015, MiMedx filed a Form 8-K with a press release that reported quarterly revenue of $49 million and stated "Q3 is the 16th consecutive quarter of meeting or exceeding revenue guidance."  In the release, Petit stated that "[o]ur nine month revenue of $135.5 million was a 72% increase over 2014, and our third quarter revenue grew by 46% to $49 million . . . ."

201.    Each of the statements described above was false or misleading because of the fraudulent and improper Distributor C, Distributor D, and Distributor E accounting described above.

202.    MiMedx, Petit, and Senken made the misstatements concerning MiMedx's revenue in the Forms 10-Q and 8-K described above.  Petit, Taylor, and Senken reviewed and approved the statements before they were made.  Senken signed the Forms 10-Q and 8-K.  Petit and Senken certified MiMedx's Form 10-Q.

203.    MiMedx, Petit, and Senken knew or were reckless in not knowing and were negligent in not knowing that the statements were false and misleading when made.

204.    The improper and premature recognition of this revenue was material because a reasonable investor would consider it important to be informed of MiMedx's actual revenue and would consider it important that MiMedx's officers were engaged in fraudulent conduct, including misstatements of revenue and deceptive acts to improperly inflate revenue because of

the fraudulent and improper Distributor C, Distributor D, and Distributor E revenue recognition. Revenue from Distributor E represented approximately 19% of MiMedx's quarterly revenue. Improperly recognized revenue from Distributor C and Distributor D represented approximately 14% of MiMedx's quarterly revenue.

<strong>E.   Fourth Quarter and Year End 2015</strong>

205.    On February 29, 2016, MiMedx filed its Form 10-K for 2015.  The Form 10-K reported fourth quarter revenue of approximately $51.84 million and operating income of approximately $7.75 million.  The Form 10-K also reported full year revenue of approximately $187.30 million and operating income of approximately $24.36 million.

206.    On January 11, 2016, MiMedx filed a Form 8-K with a press release that reported fourth quarter revenue of $51.8 million and full year revenue of $187.3 million and highlighted "the 17th consecutive quarter of meeting or exceeding revenue guidance" and "the 4th consecutive fiscal year of meeting or exceeding revenue guidance."

207.    On February 23, 2016, MiMedx filed a Form 8-K with a press release that reported four quarter revenue of $51.8 million and full year revenue of $187.3 million.  In the press release, Petit stated that "[t]he fourth quarter marked our 17th straight quarter of meeting or exceeding our revenue guidance."

208.    Each of the statements described above was false or misleading because of the fraudulent and improper Distributor A, Distributor B, Distributor C, Distributor D, and Distributor E accounting described above.

209.    MiMedx, Petit, and Senken made the misstatements concerning MiMedx's revenue in the Forms 10-Q and 8-K described above.  Petit, Taylor, and Senken reviewed and approved the statements before they were made.  Petit and Senken signed the Form 10-K, and Senken signed the Forms 8-K.  Petit and Senken certified MiMedx's Form 10-K.

210.    MiMedx, Petit, and Senken knew or were reckless in not knowing and were negligent in not knowing that the statements were false and misleading when made.

211.    The improper and premature recognition of this revenue was material because a reasonable investor would consider it important to be informed of MiMedx's actual revenue and would consider it important that MiMedx's officers were engaged in fraudulent conduct, including misstatements of revenue and deceptive acts to improperly inflate revenue because of the fraudulent and improper Distributor A, Distributor B, Distributor C, Distributor D, and Distributor E revenue recognition.  Revenue from Distributor E represented approximately 20% of MiMedx's quarterly revenue and approximately 24% of MiMedx's annual revenue. Improperly recognized revenue from Distributor A and Distributor D represented approximately 6% of MiMedx's quarterly revenue, and improperly recognized revenue from Distributor A, Distributor B, Distributor C, and Distributor D represented approximately 8% of MiMedx's annual revenue.

### F.    2016 through the Third Quarter of 2017

212.    In 2016 and 2017, MiMedx filed the following Forms 10-Q, 10-K, and 8-K containing the false or misleading statements identified below.

     a.    First Quarter 2016:  Form 10-Q, filed May 10, 2016, and Forms 8-K, filed April 11 and April 25, 2016, reported revenue of approximately $53.37 million and operating income of approximately $1.47 million.

     b.    Second Quarter 2016:  Form 10-Q, filed August 2, 2016, and Forms 8-K, filed July 12 and July 26, 2016, reported revenue of approximately $57.34 million and operating income of approximately $3.56 million.

c.  <u>Third Quarter 2016</u>:  Form 10-Q, filed November 8, 2016, and Forms 8-K, filed October 12 and October 27, 2016, reported revenue of approximately $64.43 million and operating income of approximately $4.7 million.

d.  <u>Fourth Quarter and Full Year 2016</u>:  Form 10-K, filed March 1, 2017, and Forms 8-K, filed January 11 and February 23, 2017, reported fourth quarter revenue of approximately $69.88 million and operating income of approximately $8.72 million.  The same Forms 10-K and 8-K reported full year 2016 revenue of approximately $245 million and operating income of approximately $18.45 million.

e.  <u>First Quarter 2017</u>:  Form 10-Q, filed May 1, 2017, and Forms 8-K, filed April 13 and April 28, 2017, reported revenue of approximately $72.60 million and operating income of approximately $6.19 million.

f.  <u>Second Quarter 2017</u>:  Form 10-Q, filed July 31, 2017, and Forms 8-K, filed July 17 and July 26, 2017, reported revenue of approximately $76.41 million and operating income of approximately $7.21 million.

g.  <u>Third Quarter 2017</u>:  Form 10-Q, filed October 31, 2017, and Forms 8-K, filed October 11 and October 26, 2017, reported revenue of approximately $84.57 million and operating income of approximately $8.84 million.

213.  Each of the statements described above was false or misleading because of the fraudulent and improper accounting for distributor transactions described above.

214.  MiMedx made each of the misstatements concerning its revenue and operating income in the Forms 10-K, 10-Q, and 8-K described above.

215.     Petit, Taylor, and Senken, in engaging in the conduct alleged in this complaint, acted within the course and scope of their employment and authority as the CEO, President and COO, and CFO, respectively, of MiMedx.  As such, their knowledge, recklessness, and negligence are imputed to MiMedx.

216.     The improper and premature recognition of this revenue was material because a reasonable investor would consider it important to be informed of MiMedx's actual revenue and would consider it important that MiMedx's officers were engaged in fraudulent conduct, including misstatements of revenue and deceptive acts to improperly inflate revenue because of the fraudulent and improper Distributor E revenue recognition.  Revenue from Distributor E represented approximately 9% of MiMedx's 2016 revenue.  In 2017, MiMedx improperly deducted approximately $4 million from its revenue due to its improper accounting for Distributor E transactions in previous years.

## VIII.   MiMedx, Petit, Taylor, and Senken Engaged in Deceptive Acts to Conceal their Fraudulent Revenue Recognition

217.     Each of the Defendants engaged in deceptive acts to prevent MiMedx's investors from learning about MiMedx's true financial condition, to conceal MiMedx's improper accounting practices from Auditor A, and to artificially increase revenue to show quarter-over-quarter revenue growth.  These acts, collectively, materially impacted MiMedx's stock price.

218.     In addition to the false statements made in MiMedx quarterly and annual reports, Forms 8-K, and press releases described above, from 2013 through 2015, the Defendants' deceptive acts included:

- Petit and Taylor entering into the side arrangement with Distributor E, as evidenced by, among other things, the 2013 Taylor email that materially changed the Distributor E relationship, including excusing Distributor E's payment obligation until it was

paid by the VA and crediting Distributor E for lost, damaged, or returned tissue, without Petit, Taylor, or Senken disclosing the arrangement or its implications to Auditor A;

- Taylor falsely representing to MiMedx accounting personnel that Distributor A had received a tender for the second Q2 2015 order and that the payment term was fixed;

- Taylor entering into a side agreement with Distributor A related to the Q4 2015 order agreeing to give Distributor A additional extended payment terms if the Saudi tender was delayed, without disclosing the agreement to MiMedx accounting staff or Auditor A;

- Petit and Taylor deceiving MiMedx accounting staff by falsely characterizing the Distributor B payment as a consulting payment rather than an inducement for Distributor B's $2.1 million Q2 2015 purchase order;

- Petit and Taylor entering into a side agreement with Distributor B to swap out unwanted product shipped at the end of Q2 2015 for product Distributor B could resell, without disclosing the agreement or its implications to MiMedx accounting staff or Auditor A;

- Petit and Taylor falsely telling MiMedx accounting personnel and Auditor A that Distributor A, Distributor C, and Distributor D had fixed payment terms when in fact they had told those distributors that they would be flexible as to payment;

- Petit facilitating a loan from the Petit Children to Distributor C to allow Distributor C to make payment on its Q3 2015 order and thus allow for additional revenue to be recognized in Q4, without disclosing this arrangement or its implications to MiMedx accounting staff or Auditor A;

- Petit and Senken signing false management representation letters and providing those misrepresentations to Auditor A.

219.    Defendants engaged in further acts to conceal their fraudulent actions from 2016 to 2018, during which time Petit, Taylor, and Senken made false statements to, misled, and omitted material facts from the Audit Committee, outside counsel, Auditor A, Auditor B, and others.

### A.    Deceptive Acts Related to the Controller 2 Investigation

220.    On January 18, 2016, Controller 2, a MiMedx accounting employee who reported directly to Senken and served as MiMedx Controller from approximately August 2015 to January 2016, sent an email to Senken complaining that certain transactions described above involving Distributor A, Distributor C, Distributor D, and Distributor E failed to satisfy GAAP criteria that would allow MiMedx to recognize revenue at the time of shipment.  Controller 2 also alleged internal control deficiencies related to sales personnel extending payment terms and other incentives to customers that were not disclosed to MiMedx accounting staff.

221.    On January 19, 2016, Senken forwarded Controller 2's email to the Audit Committee Chair along with "management's draft response," which Senken had prepared with the assistance of Petit and Taylor ("Management Response").  The Management Response rejected Controller 2's contentions related to revenue recognition and questioned Controller 2's understanding of the facts of each distributor relationship.

222.    In response, the Audit Committee determined to investigate Controller 2's allegations (the "Controller 2 Investigation").

223.    Petit, Taylor, and Senken each knew that the Controller 2 Investigation was, among other things, reviewing whether MiMedx had improperly recognized revenue from distributor transactions.

224.    During the Controller 2 Investigation, Petit, Taylor, and Senken concealed from the Audit Committee material information regarding the facts and circumstances of the Distributor E side arrangement, including but not limited to the information described in paragraphs 134 to 177 above.

225.    During the Controller 2 Investigation, Petit and Taylor concealed from the Audit Committee material information regarding the facts and circumstances surrounding certain MiMedx transactions with Distributor A, Distributor C, and Distributor D, including but not limited to the information described in paragraphs 31 to 57 and 86 to 133 above.

226.    During this period, Petit, Taylor, and Senken caused MiMedx to move Controller 2 to a new position where he would not have to sign a management representation letter in connection with Auditor A's 2015 annual audit.  MiMedx negotiated a severance package with Controller 2, and he left MiMedx in mid-February 2016.

227.    Based on their incomplete and inaccurate understanding of MiMedx's relationships with Distributor A, Distributor C, Distributor D, and Distributor E, the Audit Committee concluded that Controller 2's allegations were without merit.

**B.    Deceptive Acts Related to Auditor A's 2015 Annual Audit**

228.    Senken informed Auditor A about Controller 2's email on or about January 20, 2016, at a time when Auditor A was conducting its 2015 annual audit work.

229.    On or about February 4, 2016, Senken sent to Auditor A a memo describing MiMedx's relationships with Distributor A, Distributor C, Distributor D, and Distributor E substantially similar to his January 19, 2016, email to the Audit Committee Chair described above (the "February 4 Memo").

230.    Senken prepared the February 4 Memo with the assistance of Petit and Taylor. Like the Management Response, the February 4 Memo failed to disclose material information

regarding the facts and circumstances surrounding certain MiMedx transactions with Distributor A, Distributor C, Distributor D, and Distributor E, including but not limited to the information described in paragraphs 31 to 57 and 86 to 177 above.

231.    In response to further questions from Auditor A about Distributor C, on or about February 15, 2016, Petit prepared a memo to Auditor A describing the Distributor C relationship (the "Petit Distributor C Memo").

232.    The Petit Distributor C Memo was misleading in its description of Distributor C's business prospects and omitted material facts that Petit knew were relevant to Auditor A's revenue recognition analysis including but not limited to the information described in paragraphs 86 to 112 above.

233.    Petit, Taylor, and Senken each knew that Auditor A was, among other things, considering Controller 2's allegations related to Distributor E to determine if MiMedx's revenue recognition was appropriate for the relevant transactions.  They knew that Auditor A did not know about the facts and circumstances regarding the side arrangement with Distributor E, but did not disclose it to Auditor A.

234.    Petit and Taylor understood that Auditor A was, among other things, considering Controller 2's allegations related to Distributor A, Distributor C, and Distributor D to determine if MiMedx's revenue recognition was appropriate for the relevant transactions.  They knew that Auditor A did not know about the facts and circumstances regarding the side arrangements with Distributor A, Distributor C, and Distributor D, but did not disclose them to Auditor A.

235.    In light of Controller 2's allegations, Auditor A added a new representation to the management representation letter for the 2015 annual audit.  On or about February 29, 2016, Petit signed the representation and falsely stated:

Furthermore, all sales recorded by the Company to new distributors in 2015 ([Distributor C], [Distributor D], and [Distributor A]) have met the four criteria for revenue recognition pursuant to ASC 605, *Revenue Recognition*.

### C.     Deceptive Acts Related to the Audit Committee Investigation

236.    In or around November 2016, MiMedx received a demand letter from counsel for two MiMedx sales employees alleging a variety of improper and illegal conduct related to MiMedx's relationship with Distributor E, including channel stuffing and possible violations of federal health care fraud statutes.

237.    The Audit Committee led an investigation into these allegations and retained Law Firm A as external counsel, who assisted the Audit Committee with conducting interviews and reviewing documents (the "Audit Committee Investigation").

238.    Petit, Taylor, and Senken each knew that the Audit Committee Investigation was investigating, among other things, whether MiMedx had improperly recognized revenue from transactions with Distributor E.  Petit, Taylor, and Senken each knew that Law Firm A and the Audit Committee did not know the facts and circumstances regarding the side arrangement with Distributor E.

239.    During the Audit Committee Investigation, Petit, Taylor, and Senken concealed from Law Firm A and the Audit Committee material information regarding the facts and circumstances of the Distributor E side arrangement, including but not limited to the information described in paragraphs 134 to 177 above.

240.    In December 2016, Taylor directed Executive Vice President 1 to provide incomplete and misleading information to Law Firm A and the Audit Committee regarding the Reconciliation Group.  Following Taylor's instructions, Executive Vice President 1 provided the incomplete and misleading information to Law Firm A and the Audit Committee.

241.     In February 2017, Petit provided misleading and incomplete information to Law Firm A and the Audit Committee about the accuracy of information provided to Law Firm A by Distributor E.

242.     Because of deceptive acts on the part of Petit, Taylor, and Senken, Law Firm A and the Audit Committee were not aware of the true facts and circumstances of the Distributor E side arrangement.  Based on this incomplete and inaccurate understanding of MiMedx's relationship with Distributor E, the Audit Committee Investigation, among other things, did not identify MiMedx's accounting misstatements.

### D.    Deceptive Acts Related to Auditor A's 2016 Annual Audit

243.     In or around February 2017, Auditor A raised concerns about Distributor E revenue recognition related to the Fourth Amendment to the Distributor E distributor agreement, which granted Distributor E an explicit right to return inventory when the MiMedx relationship ended in July 2017.

244.     In response to those concerns, Senken prepared an accounting white paper for Auditor A, which he forwarded to Petit and Taylor for review.  An hour after Senken sent the memo to Petit and Taylor, Senken distributed a revised white paper that falsely states: "The Company continues to operate under the contractual payment terms.  There are no side agreements . . . ."  The white paper also misquotes the relevant GAAP literature.

245.     MiMedx, through Senken, provided the white paper to Auditor A.  After review, Auditor A recommended that MiMedx engage a revenue recognition expert, Consultant 1, to opine on revenue recognition under the amendment.

246.     Senken sent Consultant 1 the white paper with the false representation about payment practices.

247.    Petit, Taylor, and Senken worked with Consultant 1 to educate him about the Distributor E relationship.  Despite knowing that Consultant 1 was explicitly relying on management representations to learn the facts of the relationship, Petit, Taylor, and Senken concealed from Consultant 1 the true facts and circumstances of the Distributor E side arrangement, including the facts described in paragraphs 134 to 177 above.

248.    Petit, Taylor, and Senken understood that Consultant 1 was, among other things, reviewing the Distributor E relationship to determine if MiMedx's revenue recognition was appropriate for the relevant transactions.  They also knew that Consultant 1 would not learn the facts and circumstances regarding the side arrangement with Distributor E unless they disclosed them to Consultant 1.

249.    Based on his incomplete understanding of the Distributor E relationship, Consultant 1 concluded that MiMedx's accounting for Distributor E transactions was appropriate.  Auditor A considered Consultant 1's analysis and issued an unqualified audit opinion for MiMedx's 2016 financial statements.

250.    Petit, Taylor, and Senken concealed the true facts and circumstances of the Distributor E side arrangement from Consultant 1.  Had Consultant 1 been aware of the true facts and circumstances of the Distributor E side arrangement, he would have advised MiMedx that it could not recognize Distributor E revenue at the time of shipment.

251.    Had Consultant 1 advised MiMedx that it could not recognize Distributor E revenue at the time of shipment, then Auditor A would not have issued an unqualified audit opinion as to the presentation of MiMedx's 2016 financial statements.

252.    In light of the Audit Committee Investigation, Auditor A added a new representation to the management representation letter for the 2016 annual audit.  On or about

March 1, 2017, Petit and Senken signed the representation letter and among other things falsely

represented:

> There are no: . . . [s]ide agreements or other arrangements (either written
> or oral) that have not been disclosed to you, including any related to
> payment terms with [Distributor E] and their Product Distribution
> Agreement.

253.    Because Auditor A had an incomplete understanding of the true facts and

circumstances of the Distributor E side arrangement, it issued an unqualified audit opinion as to

the presentation of MiMedx's 2015 financial statements.

254.    On or about March 20, 2017, the SEC's Division of Corporation Finance sent

MiMedx a letter commenting on MiMedx's Form 10-K for the period ended December 31, 2016

(the "SEC Comment Letter").  The SEC Comment Letter asked MiMedx to respond to fifteen

questions, including seven questions related to revenue recognition and distributor concentration.

255.    MiMedx, through a response prepared by Petit, Taylor, and Senken and signed by

Senken, responded to the SEC Comment Letter on April 18, 2017.  The response was

subsequently made publicly available by the SEC.  Despite multiple responses directly

discussing MiMedx's relationship with Distributor E, MiMedx's response did not disclose the

side arrangement.  Among other things, MiMedx falsely represented:

a.    That the Company's independent stocking distributors, including Distributor E,

"purchase product from the Company at a price which is a discount off of list

price, contractually take title to the products when they are shipped, and then re-

sell the products to their customers.  Independent stocking distributors are

obligated to pay us regardless of when, if ever, they sell the products;" and

b.    That "Distributor E has no right to return products sold under our agreement

except in cases of defect or nonconformity."

### E.  Deceptive Acts Related to Auditor B's 2017 Annual Audit

256.    In the third quarter of 2017, MiMedx hired Auditor B as its outside auditor.

257.    In or around January 2018, in connection with Auditor B's 2017 annual audit, Auditor B raised a variety of questions about the Distributor E relationship, including questions about the adequacy of the Controller 2 Investigation and the Audit Committee Investigation.

258.    On or about February 6, 2018, Auditor B informed the Audit Committee that its questions were unresolved and that it would not complete MiMedx's 2017 annual audit until an investigation was conducted and there was resolution of current and historic allegations impacting MiMedx's revenue recognition practices.

259.    In response, Petit, Taylor, and Senken prepared a memo for Auditor B to persuade Auditor B that MiMedx's Distributor E accounting was appropriate.  The memo offered misleading and, in certain cases, false explanations for why MiMedx's Distributor E accounting was appropriate.  In the memo, Petit, Taylor, and Senken concealed from Auditor B the true facts and circumstances of the Distributor E side arrangement, including the facts described in paragraphs 134 to 177 above.

260.    In February 2018, Auditor B informed MiMedx it would not complete its audit until the conclusion of the internal investigation.  On February 20, 2018, MiMedx filed a Form 8-K attaching a press release announcing that it would delay filing its 2017 Form 10-K and that it had retained independent legal and accounting advisors to investigate allegations regarding "certain sales and distribution practices at the Company."

261.    Auditor B did not complete its 2017 annual audit.  On December 7, 2018, MiMedx filed a Form 8-K announcing that Auditor B was resigning from its engagement as MiMedx's outside auditor.

**IX.**   **MiMedx, Petit, Taylor, and Senken Profited from their Fraudulent Practices**

262.   During the relevant period, MiMedx awarded cash and equity incentive compensation to its executives pursuant to two incentive compensation plans: the Assumed 2006 Stock Incentive Plan and the 2016 Equity and Cash Incentive Plan (the "Plans").  Pursuant to the Plans, MiMedx filed Forms S-8 to register shares of stock, including the most recent Form S-8, which was filed on or about June 7, 2016.  This Form S-8 incorporated by reference MiMedx's prior and subsequent periodic filings.  During the relevant period, MiMedx obtained money as a result of its fraudulent conduct through sales of stock upon option exercise.

263.   In addition, on or about July 3, 2013, MiMedx filed a Form S-3 registering an offering of new shares in MiMedx.  That public offering raised $34 million for MiMedx.

264.   From approximately 2013 to 2018, Petit, Taylor, and Senken obtained salary, bonus cash payments, and equity compensation from MiMedx.  Upon information and belief, their salary increases, bonus levels, and equity compensation amounts were influenced by MiMedx's misstated financial performance, including revenue.

265.   Taylor sold MiMedx stock at inflated prices between approximately 2015 and 2017, earning profits from his fraud.

**X.**   **Petit, Taylor, and Senken Misled MiMedx's Auditors**

   **A.**   **Petit and Taylor Misled Auditor A in 2015 Regarding Sales to Distributor A, Distributor B, Distributor C, and Distributor D**

266.   Petit and Taylor made false or misleading statements to Auditor A about MiMedx's financial statements, MiMedx's transactions with Distributor A, Distributor B, Distributor C, and Distributor D, and MiMedx's revenue recognition practices in connection with Auditor A's audit and review work in connection with the second, third, and fourth quarters and the full year 2015.

267.    As detailed above, among other things, Petit signed management representation letters to Auditor A through which he made material false and misleading statements or omitted to state material facts necessary to make statements made not misleading.

268.    Among other things, Petit and Taylor also omitted to state material facts necessary to make statements made not misleading in communications with Auditor A regarding Distributor A, Distributor B, Distributor C, and Distributor D, including that MiMedx recognized revenue on shipments to Distributor B and Distributor C with the agreement that product could be swapped in the next quarter, that MiMedx had not determined that Distributor C's accounts receivable was collectible, that the Petit Children had loaned to Distributor C the money it used to pay down its accounts receivable balance, that MiMedx recognized revenue on sales to Distributor D where there was no agreement on the terms of the arrangement and an undisclosed right of return, and that MiMedx had granted undisclosed extended payment terms to Distributor A, Distributor C, and Distributor D.

269.    Among other things, Petit and Taylor also made material false and misleading statements or material omissions to Auditor A by:

      a.   During the year end 2015 audit of MiMedx's financial statements, falsely representing that the second quarter 2015 Distributor A sale had a fixed payment term.

      b.   During the year end 2015 audit of MiMedx's financial statements, falsely representing that the fourth quarter 2015 Distributor A sale had a fixed 180 day payment term and omitting the material information that Taylor had extended contingent payment terms and offered a right of return.

    c.   During the year end 2015 audit of MiMedx's financial statements, falsely representing that Distributor C had a fixed payment term and omitting the material information that Petit and Taylor had granted extended payment terms to allow Distributor C to sell product through to its customers.

    d.   During the year end 2015 audit of MiMedx's financial statements, representing that Distributor C had paid MiMedx $1.4 million toward its accounts receivable balance and omitting the material information that Distributor C had been denied a commercial loan and, instead, received funding from the Petit Children.

    e.   During the year end 2015 audit of MiMedx's financial statements, omitting the material information that Petit had granted Distributor D a right of return.

270.    Petit's and Taylor's misstatements and omissions to Auditor A were material because a reasonable auditor would consider it important that:

    a.   MiMedx's financial statements were not prepared in accordance with GAAP;

    b.   MiMedx's executives and accounting officers had not fulfilled their responsibilities for the design, implementation, and maintenance of internal controls;

    c.   There were material transactions that were not properly recorded; and

    d.   MiMedx officers were engaged in fraud and were aware of fraud.

A reasonable auditor would also consider it important to obtain complete and accurate information regarding MiMedx's relationships with and revenue recognition practices regarding all of its distributors and sales agents.  Auditor A relied upon the management representation letters and considered the statements made within the letters in its audits and quarterly reviews of MiMedx's financial statements.

**B.**  **Petit, Taylor, and Senken Misled Auditor A from 2015 to 2017 Regarding Sales to Distributor E**

271.     Petit, Taylor, and Senken made false or misleading statements to Auditor A about MiMedx's financial statements, MiMedx's transactions with Distributor E, and MiMedx's revenue recognition practices in connection with Auditor A's audit and review work in connection with the full years 2015 and 2016, all interim periods for those years, and the first and second quarters of 2017.

272.     As detailed above, among other things, Petit and Senken signed management representation letters to Auditor A through which they made material false and misleading statements or omitted to state material facts necessary to make statements made not misleading.

273.     Among other things, Petit, Taylor, and Senken also omitted to state material facts necessary to make statements made not misleading in communications with Auditor A regarding Distributor E, including that MiMedx had agreed to the side arrangement with Distributor E, that the Reconciliation Group existed and was responsible for managing Distributor E's payments to MiMedx and Distributor E's VA inventory, and that Taylor sent the 2013 Taylor Email.

274.     Among other things, Petit, Taylor, and Senken also made material false and misleading statements or material omissions to Auditor A by:

a.  During the year end 2015 audit of MiMedx's financial statements, falsely representing that Distributor E had slowed its payments because the relationship with MiMedx had deteriorated and omitting the material information that Distributor E persisted in paying only what it earned each week from the VA.

b.  During the third quarter of 2016 review of MiMedx's financial statement, falsely representing that Petit and Senken were not aware of any undisclosed allegations of fraud and omitting material information about the November 2016 allegations

made by two sales associates, which prompted the Audit Committee Investigation.

c.  During the year end 2016 audit of MiMedx's financial statements, falsely representing that Distributor E made payments on an irregular schedule and omitting the material information that Distributor E paid MiMedx consistently based on its weekly VA receipts and any irregular payments were the result of requests from MiMedx.

d.  During the year end 2016 audit of MiMedx's financial statements, falsely representing that Distributor E's answers to written questions from Law Firm A were inaccurate and misleading and omitting the material information that Distributor E's answers were factually accurate.

e.  During the year end 2016 audit of MiMedx's financial statements, falsely representing in an accounting white paper that MiMedx and Distributor E had no side agreements regarding payment practices and omitting material information about the Distributor E side arrangement.

275.  Petit's, Taylor's, and Senken's misstatements and omissions to Auditor A were material because a reasonable auditor would consider it important that:

a.  MiMedx's financial statements were not prepared in accordance with GAAP;

b.  MiMedx's executives and accounting officers had not fulfilled their responsibilities for the design, implementation, and maintenance of internal controls;

c.  There were material transactions that were not properly recorded; and

d.  MiMedx officers were engaged in fraud and were aware of fraud.

A reasonable auditor would also consider it important to obtain complete and accurate information regarding MiMedx's relationships with and revenue recognition practices regarding all of its distributors and sales agents.  Auditor A relied upon the management representation letters and considered the statements made within the letters in its audits and quarterly reviews of MiMedx's financial statements.

### C.    Petit, Taylor, and Senken Misled Auditor B in 2017 and 2018 Regarding Sales to Distributor E

276.    Petit, Taylor, and Senken made false or misleading statements to Auditor B about MiMedx's financial statements, MiMedx's transactions with Distributor E, and MiMedx's revenue recognition practices in connection with Auditor B's audit and review work for the full year 2017 and the third and fourth quarters of 2017.

277.    As detailed above, among other things, Petit and Senken signed a management representation letter to Auditor B through which they made material false and misleading statements or omitted to state material facts necessary to make statements made not misleading.

278.    Among other things, Petit, Taylor, and Senken also omitted to state material facts necessary to make statements made not misleading in communications with Auditor B regarding Distributor E, including that MiMedx had agreed to the side arrangement with Distributor E, that the Reconciliation Group existed and was responsible for managing Distributor E's payments to MiMedx and Distributor E's VA inventory, and that Taylor sent the 2013 Taylor Email.

279.    Among other things, Petit, Taylor, and Senken also made material false and misleading statements or material omissions to  Auditor B by:

      a.    During the year end 2017 audit of MiMedx's financial statements, falsely representing that Distributor E had slowed its payments because the relationship

with MiMedx had deteriorated and omitting the material information that

Distributor E persisted in paying only what it earned each week from the VA.

b.  During the year end 2017 audit of MiMedx's financial statements, falsely

representing that Distributor E had made no fewer than 10 payments in addition to

the normal schedule of payments and omitting material information that

Distributor E's payments followed the regular schedule and early or prepayments

were offset by reductions to subsequent regular payments.

280.   Petit's, Taylor's, and Senken's misstatements and omissions to Auditor B were

material because a reasonable auditor would consider it important that:

a.  MiMedx's financial statements were not prepared in accordance with GAAP;

b.  MiMedx's executives and accounting officers had not fulfilled their

responsibilities for the design, implementation, and maintenance of internal

controls;

c.  There were material transactions that were not properly recorded; and

d.  MiMedx officers were engaged in fraud and were aware of fraud.

A reasonable auditor would also consider it important to obtain complete and accurate

information regarding MiMedx's relationships with and revenue recognition practices regarding

all of its distributors and sales agents.  Auditor B relied upon the management representation

letter and considered the statements made within the letter in its audit and quarterly reviews of

MiMedx's financial statements.

## XI.   MiMedx Violated Various Reporting Provisions of the Federal Securities Laws; Petit, Taylor, and Senken Aided and Abetted Those Violations

281.   Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, and 13a-13

thereunder require issuers like MiMedx to file reports with the Commission containing such

information as the Commission's rules prescribe.  Further, Rule 12b-20 requires that an issuer's

statement or report contain such further material information as may be necessary to make the

required statements, in light of the circumstances under which they were made, not misleading.

282.     As described above, MiMedx filed false and misleading annual, quarterly, and

current reports during the Relevant Period.  Specifically, as detailed above, MiMedx filed false

and misleading Forms 10-K for the years 2013, 2014, 2015, and 2016, false and misleading

Forms 10-Q for each of the first, second, and third quarters of 2013, 2014, 2015, 2016, and 2017,

and false and misleading Forms 8-K on July 31, 2013, October 17, 2013, October 30, 2013,

February 26, 2014, April 7, 2014, April 25, 2014, July 28, 2014, July 29, 2014, October 14,

2014, October 30, 2014, January 12, 2015, February 26, 2015, April 14, 2015, April 28, 2015,

July 30, 2015, August 7, 2015, October 13, 2015, October 30, 2015, January 11, 2016, February

23, 2016, April 11, 2016, April 25, 2016, July 12, 2016, July 26, 2016, October 12, 2016,

October 27, 2016, January 11, 2017, February 23, 2017, April 13, 2017, April 28, 2017, July 17,

2017, July 26, 2017, October 11, 2017, and October 26, 2017.

283.     As detailed above, Petit, Taylor, and Senken aided and abetted these violations

relating to financial reporting for the annual and interim periods in 2015 by knowingly or

recklessly providing substantial assistance to those violations.  Among other things, Petit, Taylor,

and Senken provided false and misleading information for MiMedx's reports and omitted

material information from MiMedx's reports.  Further, Petit and Senken signed and certified the

Form 10-K and certified each Form 10-Q.  Senken signed MiMedx's Forms 10-Q and 8-K.

**XII.**     **MiMedx Violated Various Books and Records and Internal Controls Provisions of the Federal Securities Laws; Petit, Taylor, and Senken Aided and Abetted Those Violations**

284.     Section 13(b)(2)(A) of the Exchange Act requires issuers like MiMedx to make

and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect

the company's transactions and dispositions of the assets.  Section 13(b)(2)(B) of the Exchange Act requires issuers like MiMedx to devise and maintain a system of sufficient internal accounting controls.

285.    As detailed above, MiMedx failed to make and keep books, records, and accounts, which accurately and fairly reflected its transactions.  MiMedx also failed to establish a system of sufficient internal accounting controls.

286.    MiMedx did not have effective controls over revenue recognition and lacked effective controls:

      a.  To ensure that revenue was not recognized prior to the company obtaining written documentation demonstrating that persuasive evidence of an arrangement existed and the terms were fixed or determinable;

      b.  To ensure that adequate analysis and documentation existed for distributor contracts to ensure timely and accurate recording of revenue in accordance with GAAP;

      c.  To ensure that sales terms and incentives were appropriately documented and communicated to MiMedx's accounting staff; and

      d.  To ensure appropriate accounting for consignment arrangements.

287.    Petit, Taylor, and Senken aided and abetted MiMedx's violations of these provisions for the annual and interim periods in 2015 by knowingly or recklessly providing substantial assistance to those violations.  Among other things, Petit, Taylor, and Senken failed to implement an appropriate system of internal accounting controls; Petit, Taylor, and Senken engaged in the conduct described above that led to MiMedx's false accounting books, records, and accounts; Petit and Taylor entered into undisclosed side agreements with multiple

distributors and concealed those side agreements from MiMedx accounting staff; and Petit,

Taylor, and Senken participated in, failed to take action to prevent and failed to disclose to

Auditor A, Auditor B, Law Firm A, and the Audit Committee the side arrangements or

undocumented terms of arrangements with distributors.

### XIII.   Petit, Taylor, and Senken Violated Internal Control and Record Falsification Provisions of the Federal Securities Laws

288.    Section 13(b)(5) of the Exchange Act prohibits any person from knowingly

circumventing or failing to implement a system of internal accounting controls or knowingly

falsifying books, records, or accounts.  Similarly Rule 13b2-1 prohibits any person from directly

or indirectly falsifying or causing to be falsified books, records, or accounts.

289.    As described above, MiMedx, among other things, did not have effective controls

over revenue recognition, including a lack of effective controls: (i) to ensure that revenue was

not recognized prior to the company obtaining written documentation demonstrating that

persuasive evidence of an arrangement existed and the terms were fixed or determinable; (ii) to

ensure that adequate analysis and documentation existed for distributor contracts to ensure timely

and accurate recording of revenue in accordance with GAAP; (iii) to ensure that sales terms and

incentives were appropriately documented and communicated to MiMedx's accounting staff; and

(iv) to ensure appropriate accounting for consignment relationships.

290.    Starting no later than the first quarter of 2015, Petit, Taylor, and Senken

knowingly failed to implement an appropriate system of internal accounting controls.  Petit,

Taylor, and Senken were responsible for MiMedx's internal control structure and were aware of

the issues underlying MiMedx's internal control failures and misstated accounts.

291.    Further, internal controls were circumvented by the individual Defendants.  For

example, Petit and Taylor entered into side agreements with multiple distributors and failed to

disclose the terms of those agreements to MiMedx accounting staff, which caused MiMedx to file false financial statements.  Petit, Taylor, and Senken failed to document the side arrangement with Distributor E, which caused MiMedx to file false financial statements.  Also, Petit, Taylor, and Senken participated in, failed to take action to prevent, and failed to disclose to Auditor A, Auditor B, Law Firm A, or the Audit Committee the undocumented terms of arrangements with distributors.

292.     Petit, Taylor, and Senken falsified MiMedx's books, records, and accounts by improperly accounting for MiMedx's revenue, as detailed above.

**XIV.   Petit and Senken Made False Certifications in Connection with MiMedx's Forms 10-Q and 10-K**

293.     Rule 13a-14 of the Exchange Act requires an issuer's principal executive and financial officer to sign certifications that are included as exhibits to each periodic report containing financial statements.  As required by Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") [15 U.S.C. § 7241(a)], the certifications must state that, among other things: (1) the signing officer has reviewed the report; (2) based on the officer's knowledge, the report does not contain any untrue statement of material fact or omit to state any material fact; and (3) based on the officer's knowledge, the financial statements, and other financial information included in the report, fairly present, in all material respects, the financial condition, results of operations and cash flows for the issuer for the period presented.

294.     As detailed above, Petit certified MiMedx's Form 10-K for the period ended December 31, 2015, and Forms 10-Q for the first, second and third quarters of 2015.  Petit violated Exchange Act Rule 13a-14 in MiMedx's periodic reports identified in this paragraph by falsely certifying paragraphs 2 and 3 of the SOX 302 certifications.

295.     As detailed above, Senken certified MiMedx's Form 10-K for the period ended December 31, 2015, and Forms 10-Q for the first, second and third quarters of 2015.  Senken violated Exchange Act Rule 13a-14 in MiMedx's periodic reports identified in this paragraph by falsely certifying paragraphs 2 and 3 of the SOX 302 certifications.

## XV.    **Petit and Taylor Were Control Persons of MiMedx**

296.     Petit had significant control over MiMedx during the time period relevant to this Complaint.

297.     Petit was Chairman and CEO of MiMedx.  Petit had longstanding personal and professional relationships with the majority of MiMedx's Board of Directors and senior executive management.  He exercised control over MiMedx's general operations, set and communicated MiMedx's financial targets, and signed and/or certified MiMedx's periodic filings.  Moreover, as detailed above, he engaged in and shares culpability for the specific improper activity that is the subject of this Complaint, including transactions with Distributor B, Distributor C, Distributor D, and Distributor E.

298.     Taylor had significant control over MiMedx during the time period relevant to this Complaint.

299.     Taylor was a Director, President, and COO of MiMedx.  Taylor exercised control over MiMedx's general operations, directly supervised the sales staff, and managed the day-to-day operations of MiMedx.  Moreover, as detailed above, Taylor engaged in and shares culpability for the specific improper activity that is the subject of this Complaint, including transactions with Distributor A, Distributor B, Distributor C, and Distributor E.

## FIRST CLAIM FOR RELIEF

### Fraud—Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]
### (Against MiMedx, Petit, Taylor, and Senken)

300.    The SEC realleges and incorporates by reference paragraphs 1 to 299, as though fully set forth herein.

301.    By virtue of the foregoing, MiMedx (from 2013 through 2018) and Petit, Taylor, and Senken (from no later than 2015 through 2018), directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon another person.

302.    By reason of the conduct described above, MiMedx, Petit, Taylor, and Senken, directly or indirectly, violated, and unless restrained and enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(b)].

## SECOND CLAIM FOR RELIEF

### Fraud—Aiding and Abetting MiMedx's Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]
### (Alternatively, against Petit, Taylor, and Senken)

303.    The SEC realleges and incorporates by reference paragraphs 1 to 299, as though fully set forth herein.

304.     By virtue of the foregoing, from no later than 2015 through 2018, Petit, Taylor, and Senken each provided knowing and substantial assistance to MiMedx, who, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

305.     Accordingly, Petit, Taylor, and Senken aided and abetted and, unless restrained and enjoined, will again aid and abet, the violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

**Fraud—Control Person Liability under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for MiMedx's Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5] (Alternatively, against Petit and Taylor)**

306.     The SEC realleges and incorporates by reference paragraphs 1 to 299, as though fully set forth herein.

307.     By virtue of the foregoing, from no later than 2015 through 2018, Petit and Taylor exercised control over and culpably participated in the conduct of MiMedx, which, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

308.    Accordingly, Petit and Taylor are liable as control persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for MiMedx's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

## FOURTH CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities—Violations of Securities Act Section 17(a)**
**[15 U.S.C. § 77q(a)]**
**(Against MiMedx, Petit, Taylor, and Senken)**

309.    The SEC realleges and incorporates by reference paragraphs 1 to 299, as though fully set forth herein.

310.    By virtue of the foregoing, MiMedx (from 2013 through 2018), and Petit, Taylor, and Senken (from no later than 2015 through 2018) have, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (1) employed a device, scheme, or artifice to defraud with scienter; (2) obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in transactions, practices or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

311.    Accordingly, MiMedx, Petit, Taylor, and Senken violated and, unless restrained and enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FIFTH CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities—Aiding and Abetting MiMedx's Violations of
Securities Act Section 17(a)
[15 U.S.C. § 77q(a)]
(Alternatively, against Petit, Taylor, and Senken)**

312.    The SEC realleges and incorporates by reference paragraphs 1 to 299, as though
fully set forth herein.

313.    By virtue of the foregoing, from at least 2015 through 2018, Petit, Taylor, and
Senken each provided knowing and substantial assistance to MiMedx, who, directly or
indirectly, in the offer or sale of securities, by use of the means or instruments of transportation
or communication in interstate commerce or by use of the mails, (1) employed a device, scheme,
or artifice to defraud with scienter; (2) obtained money or property by means of an untrue
statement of material fact or omission to state a material fact necessary in order to make the
statements made, in light of the circumstances under which they were made, not misleading,
and/or (3) engaged in transactions, practices or courses of business that operated or would
operate as a fraud or deceit upon the purchasers of such securities.

314.    Accordingly, Petit, Taylor, and Senken have each aided and abetted and, unless
restrained and enjoined, will again aid and abet, violations of Section 17(a) of the Securities Act
[15 U.S.C. § 77q(a)].

## SIXTH CLAIM FOR RELIEF

**Deceit of Auditors—Violations of Rule 13b2-2 of the Exchange Act
[17 C.F.R. § 240.13b2-2]
(Against Petit, Taylor, and Senken)**

315.    The SEC realleges and incorporates by reference paragraphs 1 to 299, as though
fully set forth herein.

316.     By virtue of the foregoing, from no later than 2015 through 2018, Petit, Taylor, and Senken each, directly or indirectly, made or caused to be made materially false or misleading statements to an accountant in connection with audits, reviews, or examinations of MiMedx's financial statements or in the preparation or filing of MiMedx's documents or reports required to be filed with the SEC; or omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statement were made, not misleading, to an accountant in connection with audits, reviews, or examinations of financial statements or in the preparation or filing of MiMedx's documents or reports required to be filed with the SEC.

317.     Accordingly, Petit, Taylor, and Senken each violated and, unless restrained and enjoined, will again violate Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].

## SEVENTH CLAIM FOR RELIEF

**False Books, Records, or Accounts—Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 Thereunder**
**[15 U.S.C. § 78m(b)(5) and 17 C.F.R. § 240.13b2-1]**
**(Against Petit, Taylor, and Senken)**

318.     The SEC realleges and incorporates by reference paragraphs 1 to 299, as though fully set forth herein.

319.     By virtue of the foregoing, with respect to MiMedx's financial statements for periods in 2015, Petit, Taylor, and Senken knowingly circumvented or knowingly failed to implement a system of internal accounting controls to assure that MiMedx's financial statements were prepared in conformity with GAAP or knowingly falsified or caused to be falsified books, records, or accounts of MiMedx.

320.    Accordingly, Petit, Taylor, and Senken violated and, unless restrained and enjoined, will again violate Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder [15 U.S.C. § 78m(b)(5) and 17 C.F.R. § 240.13b2-1].

## EIGHTH CLAIM FOR RELIEF

### False Certifications—Violations of Rule 13a-14 of the Exchange Act
### [17 C.F.R. § 240.13a-14]
### (Against Petit and Senken)

321.    The SEC realleges and incorporates by reference paragraphs 1 to 299, as though fully set forth herein.

322.    By virtue of the foregoing, Petit signed and submitted SOX 302 certifications to MiMedx's 2015 Form 10-K, and MiMedx's Forms 10-Q for each quarter during 2015, in which he falsely certified paragraphs 2 and 3 of the SOX 302 certifications.

323.    By virtue of the foregoing, Senken signed and submitted SOX 302 certifications to MiMedx's 2015 Form 10-K, and MiMedx's Forms 10-Q for each quarter during 2015, in which he falsely certified paragraphs 2 and 3 of the SOX 302 certifications.

324.    Accordingly, Petit and Senken violated Exchange Act 13a-14 [17 C.F.R. § 240.13a-14].

## NINTH CLAIM FOR RELIEF

### False SEC Filings—Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13
### [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13]
### (Against MiMedx)

325.    The SEC realleges and incorporates by reference paragraphs 1 to 299, as though fully set forth herein.

326.    By virtue of the foregoing, from 2013 through 2017, MiMedx, which was an issuer of securities registered pursuant to Section 12 of the Exchange Act, filed materially false

and misleading current reports, materially false and misleading quarterly reports, and materially false and misleading annual reports with the SEC that made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13.

327.    Accordingly, MiMedx violated and, unless restrained and enjoined, will again violate Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## <u>TENTH CLAIM FOR RELIEF</u>

**False SEC Filings—Aiding and Abetting MiMedx's Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13 [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] (Against Petit, Taylor, and Senken)**

328.    The SEC realleges and incorporates by reference paragraphs 1 to 299, as through fully set forth herein.

329.    By virtue of the foregoing, with respect to MiMedx's financial statements for periods in 2015, Petit, Taylor, and Senken, each provided knowing and substantial assistance to MiMedx, who, as an issuer of securities registered pursuant to Section 12 of the Exchange Act, filed materially false and misleading current reports, materially false and misleading quarterly reports, and materially false and misleading annual reports with the SEC that made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13.

330.    Accordingly, Petit, Taylor, and Senken each aided and abetted and, unless restrained and enjoined, will again aid and abet, violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## ELEVENTH CLAIM FOR RELIEF

**False SEC Filings—Control Person Liability under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for MiMedx's Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13**
**[15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13]**
**(Against Petit and Taylor)**

331.    The SEC realleges and incorporates by reference paragraphs 1 to 299, as through fully set forth herein.

332.    By virtue of the foregoing, with respect to MiMedx's financial statements for periods in 2015, Petit and Taylor exercised control over and culpably participated in the conduct of MiMedx, which, as an issuer of securities registered pursuant to Section 12 of the Exchange Act, filed materially false and misleading current reports, materially false and misleading quarterly reports, and materially false and misleading annual reports with the SEC that made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13.

333.    Accordingly, Petit and Taylor are liable as control persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for MiMedx's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## TWELFTH CLAIM FOR RELIEF

### False Books and Records—Violations of Section 13(b)(2) of the Exchange Act
### [15 U.S.C. § 78m(b)(2)]
### (Against MiMedx)

334.    The SEC realleges and incorporates by reference paragraphs 1 to 299, as though

fully set forth herein.

335.    By virtue of the foregoing, from 2013 through 2018, MiMedx, in violation of

Section 13(b)(2) of the Exchange Act, failed to make and keep books, records, and accounts,

which, in reasonable detail, accurately and fairly reflected MiMedx's transactions and

dispositions of its assets and failed to devise and maintain a system of internal accounting

controls sufficient to provide reasonable assurances that transactions were recorded as necessary

to permit preparation of financial statements in conformity with GAAP and any other criteria

applicable to such statements.

336.    Accordingly, MiMedx violated and, unless restrained and enjoined, will again

violate Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

## THIRTEENTH CLAIM FOR RELIEF

### False Books and Records—Aiding and Abetting of MiMedx's Violations of
### Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)]
### (Against Petit, Taylor, and Senken)

337.    The SEC realleges and incorporates by reference paragraphs 1 to 299, as though

fully set forth herein.

338.    By virtue of the foregoing, with respect to MiMedx's financial statements for

periods in 2015, Petit, Taylor, and Senken each provided knowing and substantial assistance to

MiMedx, which, in violation of Section 13(b)(2) of the Exchange Act, failed to make and keep

books, records, and accounts, which, in reasonable detail, accurately and fairly reflected

MiMedx's transactions and dispositions of its assets and failed to devise and maintain a system

of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and any other criteria applicable such statements.

339.     Accordingly, Petit, Taylor, and Senken aided and abetted and, unless restrained and enjoined, will again aid and abet, violations of Section 13(b) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

### FOURTEENTH CLAIM FOR RELIEF

**False Books and Records—Control Person Liability under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for MiMedx's Violations of Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)]**
**(Against Petit and Taylor)**

340.     The SEC realleges and incorporates by reference paragraphs 1 to 299, as though fully set forth herein.

341.     By virtue of the foregoing, with respect to MiMedx's financial statements for periods in 2015, Petit and Taylor exercised control over and culpably participated in the conduct of MiMedx, which, in violation of Section 13(b)(2) of the Exchange Act, failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected MiMedx's transactions and dispositions of its assets and failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and any other criteria applicable to such statements.

342.     Accordingly, Petit and Taylor are liable as control persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for MiMedx's violations of Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

**FIFTEENTH CLAIM FOR RELIEF**

**Failure to Reimburse—Violation of Section 304(a) of the Sarbanes-Oxley Act of 2002
[15 U.S.C. § 7243(a)]
(Against Petit and Senken)**

343.    The SEC realleges and incorporates by reference paragraphs 1 to 299, as though fully set forth herein.

344.    By virtue of the foregoing, MiMedx filed reports that were in material non-compliance with its financial reporting requirements under the federal securities laws from May 10, 2013, when MiMedx's Form 10-Q for the first quarter of 2013 was filed until October 31, 2017, when MiMedx's Form 10-Q for the third quarter of 2017 was filed.  MiMedx's material non-compliance with its financial reporting requirements resulting from the misconduct required the company to prepare accounting restatements for its 2013, 2014, 2015, 2016, and 2017 financial statements.

345.    Petit and Senken received or obtained, during the statutory time periods established by the Sarbanes-Oxley Act of 2002, bonuses, incentive and/or equity-based compensation, which they have failed to reimburse to MiMedx.

346.    The SEC has not exempted Petit or Senken, pursuant to Section 304(b) of the Sarbanes-Oxley Act of 2002, from its application under Section 304(a).

347.    Accordingly, Petit and Senken violated, and unless ordered to comply will continue to violate, Section 304(a) of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243(a)].

**RELIEF SOUGHT**

**WHEREFORE**, the SEC respectfully requests that this Court:

**I.**

Find that each of the Defendants committed the violations alleged in this Complaint;

**II.**

Enter an injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each of the Defendants from violating, directly or indirectly, the laws and rules they are alleged to have violated in this Complaint;

**III.**

Order that Petit, Taylor, and Senken be permanently prohibited from acting as an officer or director of any public company;

**IV.**

Order that each of the Defendants disgorge any and all ill-gotten gains, together with pre-judgment interest, derived from the improper conduct set forth in this Complaint, plus post-judgment interest;

**V.**

Order that each of the Defendants pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], in an amount to be determined by the Court, plus post-judgment interest;

**VI.**

Order that Petit and Senken reimburse MiMedx for all bonuses, incentive-based and equity-based compensation pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243(a)];

**VII.**

Grant such other relief as this Court may deem just or appropriate.

## JURY DEMAND

The SEC demands a trial by jury on all claims so triable.

Respectfully submitted this 26 day of November 2019.

By: _____

Gregory A. Kasper
Stephen C. McKenna (*pro hac vice to be filed*)
Mark. L. Williams (*pro hac vice to be filed*)
SECURITIES AND EXCHANGE COMMISSION
Denver Regional Office
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000