UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
SECURITIES AND EXCHANGE
COMMISSION,

              Plaintiff,

     - against –

MIMEDX GROUP, INC., PARKER H.
PETIT, WILLIAM C. TAYLOR, and
MICHAEL J. SENKEN,

             Defendants.

------------------------------X

**MEMORANDUM AND ORDER**

19 Civ. 10927 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

      The Securities and Exchange Commission ("SEC") has brought this action against MiMedx Group, Inc. ("MiMedx"), Parker H. Petit ("Petit"), William C. Taylor ("Taylor"), and Michael J. Senken ("Senken").  The SEC's complaint (the "Complaint"), filed on November 26, 2019, asserts the following claims: securities fraud claims against all defendants under Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder; books and records claims against all individual defendants for violations of Exchange Act Section 13(b)(5) and of Rules 13b2-1 and 13b2-2; books and records claims against MiMedx for violations of Section 13(b)(2) of the Exchange Act; false certifications claims against Petit and Senken for violations of

Rule 13a-14 of the Exchange Act; false SEC filings claims against MiMedx for violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13; aiding and abetting claims against all individual defendants for violation of Exchange Act Sections 10(b), 13(a), 13(b)(2), 17(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13; control person liability against Petit and Taylor under Section 20(a) of the Exchange Act; and violation of Section 304(a) of the Sarbanes-Oxley Act of 2002 by Petit and Senken.   Before the Court is Senken's motion to dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).   Oral argument was held on March 23, 2022.

## BACKGROUND

**I.   Factual Background**

While the allegations in the Complaint concern activity related to Petit, Taylor, Senken, and MiMedx, we focus on those facts that are primarily relevant to the instant motion.[1]

*a. The Defendants*

MiMedx is a "regenerative medicine biotechnology company"

---

[1]   Petit and Taylor were charged in a parallel criminal action, No. 19 Crim. 850, and were both convicted on November 19, 2020.   See ECF No. 68.   Petit was found guilty of securities fraud and Taylor was found guilty of conspiracy to commit securities fraud.   Id.   Petit and Taylor were each sentenced to a one-year term of imprisonment and were fined $1,000,000 and $250,000 respectively. See 19 Crim. 850, ECF Nos. 153, 154.   Petit and Taylor have appealed their sentences.   See 19 Crim. 850, ECF Nos. 155, 156.

headquartered in Marietta, Georgia that "sells a variety of products derived from human placental, amniotic, and umbilical tissues." <u>See</u> Compl. ¶¶ 13, 17.  These products include "wound care and surgical allografts (tissue grafts transplanted between unrelated individuals) . . . and an injectable amniotic liquid product." <u>Id.</u> ¶ 18.  MiMedx's securities traded on the Nasdaq Global Market until 2018, including during the relevant period from 2013 until the third quarter of 2017. <u>Id.</u> ¶ 13.  Currently, they are traded on OTC Link. <u>Id.</u>  On July 3, 2013, MiMedx raised $34 million in an offering, filing a Form S-3 to register an offering of new shares of stock. <u>Id.</u>

Petit was MiMedx's chairman and CEO from February 2009 to June 2018, with "control over the management, general operations, sales personnel, and related policies of MiMedx." <u>Id.</u> ¶ 14.  Taylor was MiMedx's president and COO from 2011 to June 2018, served on the board of directors, and exercised control over the management, general operations, sales personnel, and related policies of MiMedx. <u>Id.</u> ¶ 15.  Senken served as MiMedx's CFO from 2011 to June 2018 and, along with Petit, signed and certified each of MiMedx's Forms 10-K and 10-Q filed between 2013 and November 2017. <u>Id.</u> ¶ 16.  Senken also signed management letters provided to MiMedx's auditors from 2013 through the second quarter of 2017

(to Auditor A) and for the third quarterly review of 2017 (to Auditor B).  Id.  Senken had previously passed the certified public accountant examination and worked as CFO of multiple companies. Id.

MiMedx followed two different sales models with its customers.  For its "direct sales" customers, MiMedx would recognize revenue at the time that product was shipped to the customer.  Id. ¶ 19.  For other customers, MiMedx would consign products, which entailed shipping product to the customer with no expectation of payment until the product was used or implanted. Id.  Revenue for this latter category of customer was recognized at the time product was used or implanted.  Id.  This revenue recognition approach is required by U.S. Generally Accepted Accounting Principles ("GAAP").  Pursuant to GAAP, companies cannot recognize revenue until the revenue was "realized or realizable and earned, which occurs only when each of the following conditions is met (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred or services have been rendered; (iii) the seller's price to the buyer is fixed or determinable; and (iv) collectability is reasonably assured."  Id. ¶ 21.  MiMedx disclosed its revenue recognition policy in its annual and quarterly financial filings during the relevant period.  Id. ¶ 22.

-4-

> *b. Distributor E Side Agreement*

From approximately 2012-2017, Distributor E sold MiMedx products to the U.S. Department of Veterans Affairs and the U.S. Department of Defense (collectively, the "VA").   Id. ¶ 134. Distributor E represented 56% of MiMedx's total reported revenue in 2013, 34% of total reported revenue in 2014, 24% of total reported revenue in 2015, and "a declining percentage thereafter." Id. ¶ 135. MiMedx's relationship with Distributor E commenced in April 2012, when the two companies entered into a written distribution agreement.   Id. ¶ 137.   Under the terms of the agreement, MiMedx made "direct sales" to Distributor E, and payment was due within a specific period of time after invoice.   Revenue was recognized based on when the product had been shipped to Distributor E.   Id. ¶¶ 137, 138.   However, "[b]y at least January 1, 2013," contrary to the terms of MiMedx and Distributor E's written agreement, Petit and Taylor entered into a side arrangement with Distributor E that changed the sales model into a "consignment model" whereby Distributor E would not pay for product until it received payment from the VA.   Id. ¶ 139.   Taylor further memorialized the terms of the side agreement in an email to Distributor E on March 8, 2013, which he did not disclose to MiMedx accounting staff, attorneys, or auditors, writing that despite the

distribution agreement "stat[ing] our legal terms and obligations . . . we need flexibility that meets both our business needs," and therefore payment would operate, as it had for the first six months of 2013, "slightly different than the way the contract is written." Id. ¶ 170.  Petit and Taylor also agreed to "credit" Distributor E for any product that was dropped, damaged, or lost, and allowed Distributor E to return product that the VA did not want to use. Id. ¶ 145-46.  Thus, under the side agreement to be consistent with GAAP, MiMedx should have recognized revenue at the time of Distributor E's payment, rather than at the time of shipment.  Id. ¶ 139.

In order to implement the side agreement, Distributor E would send a daily report to MiMedx that listed products for which it had received a purchase order from the VA, including the price charged and the patient for whom the product was used.  Id. ¶ 151. This report was sent to the Reconciliation Group within MiMedx, which was located outside of MiMedx's accounting staff, was allegedly created for the purpose of managing Distributor E's product and sales, and reported directly to Executive Vice President 1, a direct report to Taylor.  Id. ¶ 152.  No group similar to the Reconciliation Group existed for any other MiMedx customer.  Id. ¶ 160.  Executive Vice President 1 would

occasionally forward emails to Petit, Taylor, and Senken that
reported the total dollar value of VA purchase orders received by
Distributor E.   Id. ¶ 153.   The Reconciliation Group would also
create "Weekly Revenue" tables that compiled the daily purchase
order totals.   Id. ¶ 154.   These tables were circulated on a weekly
basis to Executive Vice President 1, Controller 1, who was one of
Senken's direct reports, and another accounting employee, and were
occasionally forwarded to Petit, Taylor, and Senken.   Id.
Controller 1 sent an email to Senken in September 2013 regarding
the Weekly Revenue table, stating:

> This may not be the first time that you are seeing this,
> but it is the first time that I am seeing this.  It looks
> like we tell them what to pay based on their weekly
> revenue?  So our 75-80 days for payment is only a
> coincidence.

Id. ¶ 157.   According to the SEC, Distributor E would pay MiMedx
the total amount identified in the Weekly Revenue tables "to the
penny."   Id. ¶ 155.   This payment arrangement continued from at
least January 2013 until the end of the relationship in 2017.   Id.
¶ 156.

In addition to managing and tracking the VA purchase orders
that Distributor E received, MiMedx also managed the inventory
stocked at the VA, despite the fact that under the terms of the
distribution agreement the product was owned by Distributor E.

Id. ¶ 161.  MiMedx sales staff would conduct physical counts of VA product, determine whether product had been used, and would work with the VA to generate purchase orders in situations in which a purchase order had not been sent to Distributor E.  Id. ¶¶ 162-165.

### c. MiMedx Financial Statements

According to the SEC, MiMedx improperly recognized revenue, causing its financial statements to be materially misstated for every period from the first quarter 2013 to the third quarter 2017. Id. ¶ 178.  Petit and Senken signed and certified MiMedx's public filings during this period, including Forms 10-Q, 10-K, and 8-K, which misstated MiMedx's revenue and contained misstatements with respect to revenue recognition.  Id. ¶¶ 180-216.  These financial statements were later restated in June 2018.  Id. ¶ 27.

### d. Concealment from MiMedx Auditors and Audit Committee

In addition to alleging that the defendants misled the public, the SEC further alleges that the defendants actively concealed their actions from company auditors and the Audit Committee of the Board of Directors.  Specifically, the SEC alleges that on January 28, 2016, Senken received an email from one of his direct reports, Controller 2, "complaining that certain transactions involving . . . Distributor A, Distributor C, Distributor D, and Distributor

E failed to satisfy GAAP criteria that would allow MiMedx to recognize revenue at the time of shipment."[2]   Id. ¶ 220. "Controller 2 also alleged internal control deficiencies related to sales personnel extending payment terms and other incentives that were not disclosed to accounting staff."   Id.   Senken worked with Petit and Taylor to prepare a draft response to Controller 2's email, which he then forwarded to MiMedx's Audit Committee Chair along with the email.   Id. ¶ 221.   When Senken informed Auditor A about Controller 2's email, he provided a memo in line with the response letter that he sent to the Audit Committee Chair. Id. ¶ 229.   After MiMedx's Audit Committee commenced an investigation into Controller 2's complaints, Petit, Taylor, and Senken allegedly concealed information related to the Distributor E side arrangement.   Id. ¶ 224.   Petit, Taylor, and Senken also caused MiMedx to reassign Controller 2 to a new position where he would not need to sign a management representation letter in connection with MiMedx's annual audit.   Id. ¶ 226.   A few weeks later, in mid-February 2016, Controller 2 left MiMedx and was provided a negotiated severance package.   Id. ¶ 226.   The Audit

---

[2]     Schemes related to Distributor A, Distributor B, Distributor C, and Distributor D are not alleged to have involved Senken and the SEC "is not pursuing charges against Senken related to these distributors."   SEC Memorandum of Law in Opposition to Michael J. Senken's Motion to Dismiss ("Opp'n") at 7. Therefore, they not discussed in this opinion.

Committee subsequently "concluded that Controller 2's allegations were without merit."  Id. ¶ 227.

Further, starting from the first quarter of 2013 and through the second quarter of 2017, Petit and Senken signed management representations to Auditor A, which included, among other representations, that MiMedx's financial statements were prepared in accordance with GAAP, that they had no knowledge of fraud or suspected fraud involving management, and that there were no undisclosed side agreements.  Id. ¶¶ 176-77.  Petit and Senken also signed a management representation letter containing similar representations to Auditor B in connection with the third quarter of 2017 review.  Id. ¶ 177.  The SEC alleges that in relation to audits during this time period and a separate Audit Committee investigation, Petit, Taylor, and Senken actively concealed information related to, among other things, the Distributor E side agreement and the Reconciliation Group, and provided "false representation about payment practices."  Id. ¶¶ 236-261.

> e. *Announcement of Restatements and Termination of Petit, Taylor, and Senken*

In the first quarter of 2018, Auditor B requested additional information regarding revenue recognition for Distributor E and the two Audit Committee investigations.  Id. ¶ 26.  MiMedx subsequently announced that it would delay filing a 2017 Form 10-

K and that an investigation by outside counsel would be conducted into its revenue recognition practices.  Id.  In June 2018, Petit, Taylor, and Senken separated from MiMedx, later characterized as a separation "for cause," and the company announced that it would restate its financial statements for fiscal years 2012-2016.  Id. ¶ 27.  "During [this] time period, MiMedx's stock price fell by approximately 73% . . . eliminating over $1 billion of MiMedx's shareholder value."  Id. ¶ 9.

## II. Procedural Posture

On November 26, 2019, the SEC filed its 15-claim Complaint against MiMedx, Petit, Taylor, and Senken.  See ECF No. 1.  As is relevant to the instant motion, the SEC charged Senken with securities fraud claims, books and records violations, deceit of auditors, aiding and abetting violations, and violation of Section 304(a) of the Sarbanes-Oxley Act of 2002.  See Compl. ¶¶ 300-05, 309-324, 328-330, 337-339, 343-37.

On December 4, 2019, the Court entered a final judgment on consent as to MiMedx, with MiMedx neither agreeing to nor denying the allegations in the Complaint.  See ECF No. 18.  Pursuant to the final judgment, MiMedx was required to pay a civil penalty of $1,500,000 to the SEC and was permanently enjoined from violating Sections 10(b), 13(a), and 13(b)(2) of the Exchange Act of 1934

and Section 17(a)of the Securities Act.  Id.

On February 5, 2020, the Court granted a motion to intervene filed by the United States Attorney's Office for the Southern District of New York.  See ECF No. 48.  The U.S. Attorney's Office informed the Court that it intended to move for a stay pending conclusion of a parallel criminal case involving Petit and Taylor, filed on November 25, 2019 and charging Petit and Taylor with securities fraud and with conspiracy to commit securities fraud, to make false filings with the SEC, and to improperly influence the conduct of audits.  Id.; see U.S. v. Petit, et al., No. 19 Crim. 850, ECF No. 1.  On March 11, as modified on April 1, 2020, the Court ordered a stay of discovery, with certain exceptions, pending resolution of the criminal case.  See ECF Nos. 59, 64.

On November 19, 2020, the jury in the criminal action found Petit guilty of securities fraud and Taylor guilty of conspiracy to commit securities fraud.  See ECF No. 68.  Both Petit and Taylor have appealed their convictions.  See No. 19 Crim. 850, ECF Nos. 155, 156.

On June 21, 2021, Senken filed the instant motion to dismiss. See ECF No. 80.

## STANDARD OF REVIEW

### I. Motion to Dismiss

"In considering a motion to dismiss ... the court is to accept as true all facts alleged in the complaint," and it must "draw all reasonable inferences in favor of the plaintiff." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007). In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). A claim is considered plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991).

## II. Fraud Pleading

"It is well-settled in this Circuit that a complaint alleging securities fraud must satisfy the pleading requirements of Rule

9(b) of the Federal Rules of Civil Procedure." <u>Ganino v. Citizens</u> <u>Utils. Co.</u>, 228 F.3d 154, 168 (2d Cir. 2000).  Therefore, the plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  A plaintiff relying on false or misleading public statements must identify the statements in question, identify the speaker, state when they were issued, and explain why the statements were fraudulent.  <u>See</u> <u>Shields v. Citytrust Bancorp., Inc.</u>, 25 F.3d 1124, 1128 (2d Cir. 1994).  Scienter may be "averred generally," although plaintiffs are required to allege facts that give rise to an inference of fraudulent intent.  <u>Id.</u>  However, the stricter standards of the Private Securities Litigation Reform Act ("PSLRA") do not govern SEC enforcement actions.  <u>See</u> <u>SEC v. Dunn</u>, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008) ("Any argument that Congress intended to apply the provisions of the PSLRA to SEC enforcement actions ignores the statute's plain language.").

**DISCUSSION**

**I.  Applicable Securities Laws**

*a. Fraud Claims*

Section 10(b) of the Exchange Act states that it is unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device

or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).   Rule 10b-5 implements Section 10(b) by making it unlawful, in connection with the purchase or sale of a security, "(a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or . . . omit . . . a material fact necessary in order to make the statements made . . . not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5.   Under Section 17(a), it is "unlawful for any person in the offer or sale of any securities" to: "(1) employ any device, scheme, or artifice to defraud; or (2) to obtain money or property by means of any untrue statement of material fact or any omission to state material fact necessary in order to make the statements made . . . not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).

To establish liability under Section 10(b), the SEC "is required to prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a

duty to speak) or used a fraudulent device." S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996). The elements of a claim under Section 17(a)(1) are "[e]ssentially the same" as under Section 10(b) and Rule 10b-5. S.E.C. v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999). However, scienter is not an element under subsections (2) and (3) of Section 17(a). Id.; see Aaron v. S.E.C., 446 U.S. 680, 695-96 (1980).

### b. Deceit of Auditors

Rule 13b2-2 states that "[n]o director or officer of an issuer shall, directly or indirectly: (1)[m]ake or cause to be made a materially false or misleading statement to an accountant in connection with . . . [a]ny audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart." 17 C.F.R. § 240.13b2-2. Claims made under Rule 13b2-2 do not require a showing of scienter. See S.E.C. v. Stanard, No. 06 Civ. 7736 (GEL), 2009 WL 196023, at *29 (S.D.N.Y. Jan. 27, 2009).

### c. Books and Records Violations

Section 13(b)(5) of the Exchange Act states that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" of an issuer required to file reports. 15

U.S.C. § 78m(b)(5).  Rule 13b2-1 provides that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act."  17 C.F.R. § 240.13b2-1.  While Section 13(b)(5) requires a showing of scienter, it is not an element of a claim under Rule 13b2-1.  See S.E.C. v. Stanard, 2009 WL 196023, at *29-30; S.E.C. v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998) ("[N]o scienter requirement inserted in SEC Rule 13b2-1, 17 C.F.R. § 240.13b2-1, because § 13(b) of the 1934 Act contains no words indicating that Congress intended to impose a scienter requirement.")(internal quotation marks and citation omitted).

   d. Aiding and Abetting Liability

   Section 20(e) of the Exchange Act provides that "any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." 15 U.S.C. § 78t(e). To state an aiding and abetting claim under Section 20(e), the SEC must plead "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor;

-17-

and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." S.E.C. v. Apuzzo, 689 F.3d 204, 211 (2d Cir. 2012).

> *e.* *False Certifications and Section 304 of the Sarbanes-Oxley Act*

Rule 13a-14 promulgated under the Exchange Act requires "[e]ach principal executive and principal financial officer of the issuer . . . at the time of filing of [certain public financial reports] . . . sign a certification."  17 C.F.R. § 240.13a-14. The officers must represent that "the report does not contain any untrue statement of material fact" and the information included in the report "fairly present[s] in all material respects in the financial condition, results of operations and cash flows." Id.; see also 15 U.S.C. § 7241.  Under Section 304 of the Sarbanes-Oxley Act, when an issuer restates its financial statements due to misconduct, the CEO and CFO are required to "reimburse the issuer" for any bonus or incentive-based compensation from the issuer during the 12-month period following the first issuance or filing, as well as any profits realized from sale of securities during that 12-month period.  15 U.S.C. § 7243.

## II.  The SEC Pleads Facts That Raise a Strong Inference That Senken Acted With Scienter

Senken primarily focuses his motion on attacking the scienter

element of the SEC's claims.[3]  Thus, the central question that we must address in evaluating his motion to dismiss is whether the SEC has plead facts that plausibly raise a strong inference of scienter, as required by the SEC's 10(b), 10b-5, 17(a)(1), 13(b)(5), 13a-14, and aiding and abetting claims.

Scienter is the "intent to deceive, manipulate, or defraud." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co. ("ECA"), 553 F.3d 187, 198 (2d Cir. 2009) (internal quotation marks and citation omitted).  In order to plead a strong inference of scienter, a complaint must allege facts "showing either [(1)] a motive and opportunity to commit the fraud, or [(2)] strong circumstantial evidence of conscious misbehavior or recklessness."  Emps.' Ret. Sys. Of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 306 (2d Cir. 2015) (internal quotation marks and citation omitted).  "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check

---

[3]    Not all of the SEC's charges against Senken require a showing of scienter. Scienter is not a required element of the Section 17(a)(2) and (3) and Section 13(b)(2) claims.  Thus, even if Senken were successful in his argument regarding scienter, it would not necessarily dispose of these claims.

information they had a duty to monitor." Id. (internal quotation marks and citation omitted).

a. *Motive and Opportunity*

The SEC alleges that Senken "obtained salary, bonus cash payments, and equity compensation from MiMedx . . . influenced by MiMedx's misstated financial performance, including revenue." See Compl. ¶ 264. These incentives are not sufficient to establish motive and opportunity, as they are "no different from [those of] any other corporate executive whose compensation is tied to stock price." S.E.C. v. Espuelas, 698 F. Supp. 2d 415, 427 (S.D.N.Y. 2010). "[T]he existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter." Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995); S.E.C. v. China Northeast Petroleum Holdings Ltd., 27 F. Supp. 3d 379, 388 (S.D.N.Y. 2014) ("[T]he desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation do not constitute motive for purposes of this inquiry.") (internal quotation marks and citation omitted). Thus, the Complaint fails to adequately allege motive and opportunity as to Senken.[4]

---

[4]     This discussion of Senken's executive compensation and bonus payments is in contrast to the discussion of Section 17(a)(2) liability, see Section IV infra.

*b. Conscious Misbehavior or Recklessness*

The second means of establishing scienter requires a showing by circumstantial evidence of conscious misbehavior and recklessness.  See ECA, 553 F.3d at 198-99.  In order to show conscious misbehavior and recklessness, a plaintiff must show, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000).  The Court concludes that the SEC has sufficiently alleged scienter through a showing of conscious misbehavior and recklessness.

As an initial matter, Senken was the CFO of Mimedx from 2011 to June 2018, had prior experience as the CFO of multiple other companies, and had passed the certified public accountant examination.  See Compl. ¶ 16.  As part of his job responsibility, Senken supervised MiMedx's accounting group.  See Memorandum of Law in Support of Michael J. Senken's Motion to Dismiss the Complaint ("MTD") at 3; Compl. ¶¶ 154, 220.  In this capacity, Senken was forwarded emails from both the Reconciliation Group reporting "the total dollar value of VA [Purchase Orders] Distributor E had received," as well as "Weekly Revenue" tables

that compiled daily totals of Distributor E's daily reports.  See
Compl. ¶¶ 153-54.  Given that these reports were created solely
for the purpose of tracking Distributor E's product and would not
have been needed under the terms of payment of the original
Distributor E agreement, and given that Distributor E would pay
"MiMedx the total cash amount identified in the Weekly Revenue
table, to the penny," an individual in Senken's position and with
his background would have been aware that Distributor E was not
following the terms of the written agreement.  Senken therefore
"knew facts or had access to information suggesting that [MiMedx's]
public statements were not accurate[] or [] failed to check
information [he] had a duty to monitor."  Blanford, 794 F.3d at
306.  Further, no other distributor had an account that was managed
in this manner.  See Compl. ¶ 160.

     Senken's arguments that he did not supervise the
Reconciliation Group and was not copied on Taylor's March 2013
email to Distributor E regarding the side agreement are
insufficient to negate his knowledge or recklessness.  See Opp'n
at 12.  Regardless of whether Senken was involved in the initial
discussions with Distributor E, he was clearly aware of the
arrangement or reckless for not knowing of it.  Senken's receipt
of daily purchase order totals and weekly revenue tables generated

by the Reconciliation Group also supports the inference that he
was aware of the group's existence and the reason for its creation,
again showing that he "knew facts or had information" that
suggested MiMedx's financial statements were false or that he
"failed to check [that information]" even though he had a duty to
monitor it as part of his job responsibilities. Blanford, 794
F.3d at 306.

Senken further argues that the SEC fails to explain why he
"would have scrutinized the basis for the payments behind this
cash flow information for indications of the alleged side
agreement." See Opp'n at 15. Accepting this argument would
require the Court to believe that the CFO of a publicly traded
company with Senken's job history would not have understood the
significance of this information. Further, this argument
drastically downplays Distributor E's importance to MiMedx, as it
represented 56% of MiMedx's total reported revenue in 2013; 34% of
total reported revenue in 2014; 24% of total reported revenue in
2015; "and a declining annual percentage thereafter." Compl. ¶
135. Between 2012 and 2017, MiMedx reported over $150 million in
revenue from Distributor E, despite having not collected 8% of
this reported revenue. Id. at 136. It is more than reasonable to
infer that a CFO would have, and should have, paid attention to

financial information regarding a customer as important as Distributor E.[5]

Furthermore, the Complaint identifies two specific emails sent to Senken by direct reports that highlighted the unusual circumstances surrounding MiMedx's handling of Distributor E's account.  See Compl. ¶¶ 157-58, 220-22.  The first email was sent in September 2013 by one of Senken's subordinates, Controller 1.  See Compl. ¶ 157.  In the email, Controller 1 forwarded a weekly revenue table for Distributor E, stating:

> This may not be the first time that you are seeing this, but it is the first time that I am seeing this.  It looks like we tell them to pay based on their weekly revenue? So our 75-80 days for payment is only a coincidence.

Id.[6]  According to the complaint, Senken did not react to this email, and there is no indication that he conducted any further review in order to determine the reason that Distributor E was

---

[5]    Senken is correct that "a corporate officer or director by virtue of his status cannot, without more, be charged with knowledge of activities within the corporation."  See MTD at 17 (quoting Matsumura v. Benihana Nat'l Corp., 542 F. Supp. 2d 245, 255-56 (S.D.N.Y. 2008)).  There is ample "more" here, as Senken's knowledge is based on information that was sent directly to him regarding payments from Distributor E and MiMedx's monitoring of Distributor E product at the VA.

[6]    According to Senken, since this email "does not reflect that Controller 1 knew of the alleged side agreement," and since weekly revenue tables had been circulated since January 2013, it is implausible that Senken would have known about the side agreement based on receiving emails containing the daily reports and weekly revenue tables.  See Reply Memorandum of Law in Support of Michael J. Senken's Motion to Dismiss the Complaint at 9.  However, it is clear from Controller 1's email that it was "the first time that [he was] seeing [the weekly revenue table.]"  See Compl. ¶ 157.  Therefore, it is reasonable that Controller 1 expressed surprise and notified Senken immediately.  The effort to impute Controller 1's ignorance to Senken is illogical.

operating on a consignment basis, again "fail[ing] to check on information [he] had a duty to monitor."[7]  Blanford, 794 F.3d at 306.

On January 18, 2016, another of Senken's subordinates, Controller 2, emailed Senken regarding MiMedx's business practices with respect to Distributors A-E, expressing the belief that MiMedx was violating GAAP with respect to the timing of revenue recognition.  See Compl. ¶ 220. As set out supra, pp. 8-9, Senken, along with Petit and Taylor, crafted a response to this email that was sent to the Audit Committee Chair and MiMedx's outside auditor, disputing Controller 2's allegations.   Id. ¶ 221.

Further, Senken, working with Petit and Taylor, concealed material information regarding the Distributor E side agreement from investigations by both the Audit Committee and MiMedx's auditor, including by arranging for the transfer and subsequent dismissal of Controller 2.  Id. ¶¶ 225-26, 228-35.  These actions further support a finding of scienter, given that Senken was aware

---

[7]    Senken's citation to City of Brockton Retirement Sys. v. Avon Prods., Inc., No. 11 Civ. 4665 (PGG), 2014 WL 4832321 at *24 (S.D.N.Y. Sept. 29, 2014) is inapposite. Senken neither conducted an investigation nor publicly disclosed Controller 1's email.  Rather the allegations here involve a deliberate effort to avoid inquiry into the payment arrangement with Distributor E and to thwart the disclosure of the facts.  On the other hand, in Avon, the court found that an executive's receipt of a whistleblower letter did not raise an inference of corporate scienter even though the company did not disclose the allegations in the letter in its next financial disclosures, but rather commenced an internal investigation and thereafter disclosed the whistleblower letter in a subsequent public filing.  Id.

that Distributor E's account was being handled in a different manner than was being presented to the Audit Committee.[8]

Finally, in addition to pleading Senken's scienter with regards to Distributor E's consignment payment structure under the side agreement, the Complaint also establishes that Senken was aware, or reckless in not being aware, of Distributor E's right of return.  As stated above, the emails that Senken received from Controller 1 and 2, in addition to the daily report and weekly revenue table emails, were sufficient to inform him that Distributor E was returning product in violation of the terms of the written contract.

### III. The Complaint Alleges Material Misstatements

Senken also raises multiple arguments that the SEC has failed to allege that MiMedx materially misstated its revenue.  See MTD at 19.  Specifically, he contends that the SEC fails to allege that MiMedx's reported revenue was materially false, that the Complaint fails to identify and specify the alleged misstatements to MiMedx's auditors, and that Senken's statements regarding MiMedx's financial results were "non-actionable statements of

---

[8]     Senken cites to Constr. Laborers Pension Tr. For S. California v. CBS, 433 F. Supp. 3d 515 (S.D.N.Y. 2020) and Slayton v. Am. Exp. Co., 604 F.3d 758 (2d Cir. 2010) to argue that his actions undercut scienter because he reported Controller 2's email to the Audit Committee and the Audit Committee later found Controller 2's concerns to be without merit.  See MTD at 16.  These cases are inapposite.  In neither case did the defendant actively conceal material information from investigators, as Senken is alleged to have done.

opinion." Id. at 19-24.

Senken maintains that the SEC's fraud and false certification claims must be dismissed because the SEC "did not allege any material misstatements concerning Distributor E." See MTD at 23. A statement is material for the purposes of Section 10(b) if a reasonable investor would consider it to be significant in making an investment decision. See Basic Inc. v. Levinson, 485 U.S. 224, 224 (1988). Issues of materiality "will rarely be dispositive in a motion to dismiss," unless "they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." In re Morgan Stanley Information Fund Sec. Litig., 592 F.3d 347, 360 (2d Cir. 2010) (internal quotation marks and citation omitted).

First, the alleged misstatements in this case concern MiMedx's reported revenue, which is the exact type of information that would be important to a reasonable investor. See Ganino v. Citizens Utilities Co., 228 F.3d 154, 164 (2d Cir. 2000) ("Misstatements of income could be material because 'earnings reports are among the pieces of data that investors find most relevant to their investment decision.'") (quoting In re Burlington Coat Factory, 114 F.3d 1410, 1420 n.9 (3d Cir. 1997)); In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398, 410 (S.D.N.Y.

1998) ("Profit statements generally will be of particular interest to investors."). MiMedx eventually restated four years of its financial statements to correct errors involving revenue recognition set forth in prior statements, which in and of itself shows that the misstatements were material. See Compl. ¶ 27. Pursuant to GAAP, financial statements "should be restated only to correct material accounting errors that existed at the time the statements were originally issued." In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004); S.E.C. v. Kelly, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) ("[U]nder Generally Accepted Accounting Principles, a restatement issues only when errors are material.").

Second, as previously stated, Distributor E was MiMedx's largest customer and was responsible for substantial portions of MiMedx's total reported revenue during the period in question, including representing 56% of total reported revenue in 2013, 34% in 2014, and 24% in 2015. See Compl. ¶ 135. Third, following the disclosure of MiMedx's improper revenue recognition practices and the need for restatements of the company's financial statements, MiMedx's stock price fell by approximately 73%, indicating that investors found this information to be significant. See Compl. ¶ 9.

Senken's second argument is likewise without merit. The Complaint clearly specifies that Senken made alleged misstatements to Auditors A and B in the following manner: "[i]n connection with each Auditor A quarterly review and Auditor A annual audit from the first quarter of 2013 through the second quarter of 2017, Petit and Senken signed management representation letters to Auditor A." See Compl. ¶ 176. In addition, the Complaint states that "[o]n or about October 31, 2017, Petit and Senken signed a management representation letter to Auditor B in connection with Auditor B's third quarter of 2017 review." Id. ¶ 176. The Complaint alleges that these letters contained misstatements regarding, among other things, that MiMedx's financial statements were prepared in accordance with GAAP, that Petit and Senken had no knowledge of fraud or suspected fraud involving management, and that all side agreements and arrangements had been disclosed to the auditors. Id. ¶ 177.

Senken's third argument, that his statements regarding MiMedx's financial results are non-actionable opinions is, to be generous, borderline risible. MiMedx's reported revenue figures are not matters of opinion. See In re AmTrust Fin. Services, Inc. Sec. Litig., No. 17 Civ. 1545 (LAK), 2019 WL 4257110, at *14 (S.D.N.Y. Sept. 9, 2019) ("If the numbers underlying th[e] data

[presented in public filings] consist only of figures that were then presently known, fixed, or definite . . . then any resulting data would be a statement of fact.").[9]  MiMedx's reported revenue represented "historical income metrics that [did] not involve any inherently subjective valuations," and application of the appropriate GAAP standard, and the terms of the side agreement, "called only for . . . objective criteria."  Id.

## IV.  The Complaint Alleges That Senken Obtained Money or Property Through his Misstatement and Omissions

Senken argues that the Section 17(a)(2) claims against him should be dismissed on the basis that he is not alleged to have "personally obtained money or property."  See MTD at 26.  Both parties concede that there is a split of authority in this District as to whether a defendant must have personally gained money or property, or whether it is sufficient to have obtained money or property on behalf of an employer, in order to be liable under

---

[9]      Senken relies on Sjunde AP-Fonden v. Gen. Elec. Co., 417 F. Supp. 3d 379 (S.D.N.Y. 2019) and N. Collier Fire Control and Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc., No. 15 Civ. 6034 (RJS), 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) to argue that MiMedx's revenue figures are statements of opinion.  See MTD at 20-21.  The financial metrics that were identified as opinions in these cases were not reported revenue figures.  See Sjunde AP-Fonden, 417 F. Supp. at 404 (finding revenue and profit projections to be opinions); N. Collier Fire Control, 2016 WL 5794774, at *9 (finding goodwill balances to be opinions).  Senken also cites Pearlstein v. BlackBerry Ltd., 93 F. Supp. 3d 233 (S.D.N.Y. 2015) to support his contention that MiMedx's revenue figures reflected subjective accounting judgments based on the fact that GAAP allows companies to recognize revenue early in certain situations.  Id. at 242-43.  However, unlike in Pearlstein, the side agreement created a consignment model with Distributor E, which removed any subjectivity as to when revenue could be recognized.

Section 17(a)(2).  See id.; Opp'n at 25; compare S.E.C. v. Stoker, No. 11 Civ. 7388 (JSR), 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012) (Judge Rakoff "conclude[d] that it is sufficient under Section 17(a)(2) for the SEC to allege that Stoker obtained money or property for his employer while acting as its agent, or, alternatively, for the SEC to allege that Stoker personally obtained money indirectly from the fraud.") with S.E.C. v. Syron, No. 11 Civ. 9201 (RJS), 934 F. Supp. 2d 609, 640 (S.D.N.Y. 2013) (Judge Sullivan, then a district judge, found that a requirement "whereby the defendant personally gains money or property from the fraud, is essential, for otherwise the defendant may have fraudulently induced the victim to part with money or property, but he has not obtained that money or property himself.").

This Court adopts Judge Rakoff's reasoning in the Stoker case, finding that Senken "obtained money or property for his employer while acting as its agent" and "personally obtained money indirectly from the fraud." Stoker, 865 F. Supp. 2d at 463. The Complaint alleges that Senken "obtained salary, bonus cash payments, and equity compensation . . . [that were allegedly] influenced by MiMedx's misstated financial performance, including revenue."[10]  See Compl. ¶ 264.  The SEC also alleges that "MiMedx

_____

[10]    This analysis is separate from our analysis of Senken's scienter based on motive and opportunity, supra Section II.a.  Section 17(a)(2) does not require

filed Forms S-8 to register shares of stock, including the most
recent Form S-8, which was filed on or about June 7, 2016," and
subsequently "MiMedx obtained money as a result of its fraudulent
conduct through sales of stock upon option exercise."   See id. ¶
262.

**V.   The Complaint Alleges "Scheme Liability"**

Senken argues that the SEC inadequately alleges "scheme
liability" under Rule 10b-5 (a) and (c) and Section 17(a)(1) and
(3) because the Complaint fails to allege a deceptive act by Senken
distinct from the misstatements.   See MTD at 25.   Senken further
argues that courts have dismissed scheme liability claims "where
the primary purpose and effect of a purported scheme is to make a
public misrepresentation or omission."   S.E.C. v. Kelly, 817 F.
Supp. 2d 340, 343 (S.D.N.Y. 2011).

The SEC argues that the Supreme Court's decision in Lorenzo
v. S.E.C., 139 S.Ct. 1094 (2019) "reject[s] this very argument."
See Opp'n at 23.   However, there is a split in authority regarding
Lorenzo's holding.

On the one hand, Senken cites to two cases in this Circuit in
which courts found that Lorenzo did not change the requirement

---

a finding of scienter.   See Aaron v. S.E.C., 446 U.S. 680, 697 (1980).   Rather,
this analysis is solely focused on whether the SEC has pled the element of
Section 17(a)(2) that requires a showing that a defendant "obtain money or
property."

that a plaintiff plead additional deceptive acts beyond mere misstatements.  See S.E.C. v. Rio Tinto plc, No. 17 Civ. 7994 (AT) (DCF), 2021 WL 818745 (S.D.N.Y. Mar. 3, 2021); In re Teva Sec. Litig., No. 17 Civ. 558 (SRU), 2021 WL 1197805 (D. Conn. Mar. 30, 2021).

On the other hand, the SEC also cites a number of post-Lorenzo cases to support its position.  See S.E.C. v. SeeThruEquity, LLC, No. 18 Civ. 10374 (LLS), 2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019) ("The Court's holding in Lorenzo is clear: 'Those who disseminate false statements with intent to defraud are primarily liable under Rules 10b-5(a) and (c), § 10(b), and § 17(a)(1), even if they are secondarily liable under Rule 10b-5(b).'"); S.E.C. v. Winemaster, No. 19 Civ. 4843, 2021 WL 1172773, at *918 (N.D. Ill. Mar. 29, 2021) (finding that defendant's "claims that Rule 10b-5(a) and (c) require deceptive acts distinct from an alleged misstatement forming the basis of a Rule 10b-5(b) claim . . . [are] no longer tenable" in light of Lorenzo); In re Cognizant Tech. Sols. Corp. Sec. Litig., No. 16 Civ. 6509, 2020 WL 3026564, at *17 (D.N.J. June 5, 2020) ("Thus under Lorenzo, unlike prior precedent, a plaintiff need not necessarily allege deceptive conduct that extends beyond the alleged misstatement itself.").

Ultimately, we need not endeavor to resolve this debate.

Here, the Complaint adequately alleges that Senken engaged in deceptive acts beyond issuing misstatements, including his concealment of material facts from MiMedx's Audit Committee and auditors.  See, e.g., Compl. ¶¶ 177, 224-28.  Thus, the SEC has satisfied its burden in pleading "scheme liability" as to Senken.

## VI.  The Complaint has Alleged Books and Records Violations

Senken moves to dismiss the charges of books and records violations by arguing that "the Complaint fails to sufficiently allege that MiMedx's internal controls were inadequate under Section 13(b)(2)(B)."  See MTD at 27.  However, the SEC is not required to establish that MiMedx's internal controls were inadequate in order to succeed on its books and records claims. In order to prove a Section 13(b)(5) and Rule 13b2-1 violation, "the SEC must demonstrate that [Senken] knowingly circumvented or failed to create and maintain a system of internal accounting controls, or alternatively, that [he] knowingly falsified the books, records, or accounts of [MiMedx]."  S.E.C.  v. 800america.com, Inc., No. 02 Civ. 9046 (HB), 2006 WL 3422670, at *11 (S.D.N.Y. Nov. 28, 2006).  The SEC has alleged that Senken acted with scienter, and that he concealed material information from MiMedx's Audit Committee and auditors, thereby circumventing MiMedx's internal controls.  See, e.g. Compl. ¶¶ 176-177, 229-30,

252, 272.

### VII. The Complaint Sufficiently Alleges Violations of Section 304 of the Sarbanes-Oxley Act

Senken's final argument, that the SEC has not sufficiently established violations of Section 304 of the Sarbanes-Oxley Act, is likewise without merit.  Section 304 requires a CEO or CFO to disgorge bonuses, incentive-based compensation, or profits realized from sales of securities, to an issuer that has restated its financial statements due to misconduct.  15 U.S.C. § 7243. The disgorgement period is calculated as a 12-month period following the first improper filing.  Id.

As an initial matter, we have concluded that the Complaint has adequately alleged misconduct by Senken.  The SEC has also listed the first public filing relating to the misconduct in question.  The Complaint states that "MiMedx filed reports that were in material non-compliance with its financial reporting requirements under the federal securities laws" and were later restated.  See Compl. ¶ 344.  The SEC has identified the Forms 10-K filed on March 13, 2015, February 29, 2016, and March 1, 2017, as having been restated.  See Compl. ¶¶ 180(h), 205, 212(d); Opp'n Ex. A (ECF No. 85-1) at 28.[11]   Further, given that these

---

[11]    While the SEC alleges that MiMedx restated its Form 10-Qs for the first through third quarter of 2017, MiMedx's 2018 Form 10-K, which disclosed the various restatements, makes no reference to restating financial statements from

restatements were filed after November 26, 2014, the SEC's allegations are not time-barred.

## CONCLUSION

For the reasons stated above, Senken's motion to dismiss is denied in its entirety.  The SEC has sufficiently pled scienter, materiality, Section 17(a)(2) liability, scheme liability under Rule 10b-5 (a) and (c) and Section 17(a)(1) and (3), books and records violations under Section 13(b)(2)(B), and violations of Section 304 of the Sarbanes-Oxley Act.  The Clerk of the Court is respectfully directed to terminate the motion pending at ECF No. 80.

**SO ORDERED.**

Dated:    New York, New York
          March 28, 2022

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

2017 and only references financial statements as of period ended December 31, 2016, 2015, 2014, 2013, and 2012.  See Opp'n Ex. A (ECF No. 85-1) at 28.

-36-